GREEN et al., Appellants and Cross–Appellees,

v.

LEMARR et al., Appellees and Cross–Appellants.

[Cite as *Green v. Lemarr* (2000), 139 Ohio App.3d 414.]

Court of Appeals of Ohio,
Second District, Greene County.

No. 2000–CA–6.

Decided Oct. 6, 2000.

*Andrew C. Storar* and *Michael W. Sandner,* for appellants.

*Noel K. McKeown* and *Stephen Haller,* for appellees.

BROGAN, Judge.

This case involves a bitter dispute between adjoining property owners over about one-tenth of an acre of land. The dispute has been played out through repeated calls to the police to report "missing property stakes," general acrimony in the trial court, and opposing motions for a restraining order to prevent the other party from entering the disputed property.

Originally, John and Anna Bocklet owned approximately 13.94 acres of land in Greene County, Ohio. On August 13, 1955, a registered surveyor, Ben Pierce, conducted a survey, and a 1.20-acre parcel was subdivided from the main parcel. The small parcel was then conveyed to Robert and Betty Beason on September 6, 1955. At the time, Greene County did not require surveys to be filed, and Pierce

did not file a survey. However, the deed indicated that it was based on Pierce's survey of August 13, 1955.

Subsequently, on April 5, 1957, the Beasons conveyed their parcel to Chester and Miriam Barton. In turn, the Bartons conveyed their land to Wesley and Edith Green on April 6, 1959. After owning the land for more than twenty years, Mr. Green conveyed it to his son, Louis, and Louis's wife, Joyce, on December 18, 1979. Louis and Joyce Green were the plaintiffs below, and still owned the property at the time they filed their lawsuit in June 1996.

The main 12.74-acre parcel was kept by the Bocklets for some time but was then sold. A subsequent owner, Richard Bull, conveyed this parcel to the defendants, Mike and Janet Lemarr, on September 21, 1991. At some point after the Lemarrs bought the property, a dispute arose about the ownership of the land abutting a creek or channel. Mr. Green maintained that the property line was on the east side of the creek, which would mean that he owned the creek and the adjoining land. In contrast, Mr. Lemarr claimed that the property line was on the west side of the creek, and that the disputed land belonged to him.

Mr. Green was a licensed surveyor. On May 3, 1996, Mr. Green filed an affidavit with the Greene County Recorder, indicating that the deed conveying the 1.20-acre parcel was erroneous and did not conform to the intent of Pierce's original survey of August 13, 1955. In the affidavit, Green pointed out various discrepancies between the deed and survey, including the fact that the survey placed the property line on the east side of a stone-walled channel, while the deed placed the same courses and distances on the west side of the ditch. Subsequently, Green commissioned surveyor Randy Norfleet to perform a resurvey. Norfleet attempted to retrace Pierce's original survey notes and concluded that the property line was on the east side of the creek. After Norfleet's survey was filed in the Greene County Surveyors' Records, the Greens transferred their property, with a revised description, to trustees. The trustees then transferred the land back to the Greens, and this action to quiet title followed.

The Lemarrs answered the complaint and also filed a counterclaim for slander of title. In the counterclaim, they alleged that Mr. Green had removed survey monuments along the true boundary and had wrongfully filed documents to gain title to 0.153 acres of disputed land. They also raised the issue of adverse possession.

On October 8, 1996, the matter was referred to a magistrate, who subsequently issued three decisions. The first, on October 13, 1997, granted summary judgment to the defendants. The second, on February 19, 1998, corrected some errors in the first decision, awarded the defendants judgment on their counterclaim, and overruled the plaintiffs' motion for summary judgment. Finally, the third decision awarded defendants $602.50 in attorney fees. Eventually, on

December 10, 1999, the trial court adopted the magistrate's decisions, after overruling the objections of both sides. This appeal then followed.

Appellants (the Greens) raise the following five assignments of error:

"I. The trial court erred in confirming the Magistrate's Decision [*sic*] failing to find that there were survey pins at the 159 foot mark along Gultice Road, failing to find that there were no survey pins on the west side of the stone ditch, failing to find that the two surveyors hired by the Plaintiff found that there was monumentation of a fallen tree noted in the description, and failing to find that the intent of the original surveyor was to have the line fall on the east side of the natural monument, the ditch, dividing the parties' property.

"II. The trial court erred in confirming the Magistrate's Decision [*sic*] failing to apply the law of boundaries as stated by the Ohio Supreme Court.

"III. The trial court erred in confirming the Magistrate's Decision [*sic*] failing to find the 'survey' relied upon by the Defendant was not, in fact, a survey of the Plaintiff's property, but only an attempt to locate the dividing line between Plaintiff's and Defendant's property and that it did not comport with Ohio Revised Code, Chapter 4733 and its Administrative Rules.

"IV. The trial court erred in confirming the Magistrate's Decision wherein she failed to consider the letter sent by Randy Norfleet, a surveyor, and the response of the State Board of Registration for Professional Engineers and Surveyors. The trial court further erred in confirming the Magistrate's Decision wherein she incorrectly found the letters to be immaterial despite the fact that Norfleet's survey found the disputed property line to be as claimed by the Plaintiff.

"V. The trial court erred in confirming the Magistrate's Decision wherein she found slander of title."

On the cross-appeal, appellees (the Lemarrs), assert the following two assignments of error:

"I. The trial court erred to the prejudice of the Defendant Appellees [*sic*] when it ruled that they were entitled to an award of only $602.50 in attorney fees.

"II. The trial court erred to the prejudice of the Defendant Appellees [*sic*] when it ruled that they were not entitled to an award of special damages as they related to timber removed from the land, removed boundary markers, and other similar events."

After considering the record and the assignments of error, we find that genuine issues of material fact precluded summary judgment. Accordingly, this matter will be reversed and remanded to the trial court for further proceedings. An explanation of our decision follows.

I

In the first two assignments of error, appellants point out various factual and legal deficiencies in the decisions of the magistrate and trial court. In particular, appellants focus on the failure of the magistrate and trial court to consider relevant evidence from surveyors and to correctly apply the law of boundaries. Although the assignments of error do not specifically mention the existence of genuine issues of material fact, we interpret appellants' argument to be that such issues of fact exist. Furthermore, appellants raised the fact that the case was not appropriate for summary judgment when they filed objections to the magistrate's report.

Our review of summary judgment decisions is *de novo, i.e.,* we apply the standards used by the trial court. *Long v. Tokai Bank of California* (1996), 114 Ohio App.3d 116, 119, 682 N.E.2d 1052, 1054–1055. Under well-established standards, "summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor." *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201, 204.

Before specifically applying summary judgment standards to this case, we should note that the procedural history of this case is troubling. Shortly after the Lemarrs' answer was filed, the trial court referred the matter to a magistrate and set various deadlines. In an entry, which was filed on October 8, 1996, the court scheduled a pretrial for December 18, 1996. Additionally, the court set discovery and motion deadlines for thirty days prior to the pretrial, meaning that the parties had only about six weeks to conduct discovery. A January 22, 1997 hearing date (presumably a trial date) was also set.

In pretrial statements filed in December 1996, both sides disclosed the identity of witnesses and reserved the right to add witnesses as needed. Subsequently, on December 12 1996, the Greens asked for leave to file a motion for summary judgment. On December 18, 1996, the court filed an entry giving both sides until December 31, 1996, to submit motions for summary judgment. Before the deadline passed, the Greens asked for more time and were given until January 22, 1997, to file their motion. The motion was timely filed, and the court set a deadline of February 11, 1997, for responses. To support their motion, the Greens relied on the filed deposition of surveyor, Randy Norfleet, and affidavits from Louis Green and his siblings about the correct location of the property line.

After the motion deadline had passed, the Lemarrs asked for permission to file for summary judgment. As a result, the court gave the Lemarrs until March 4,

1997, to file both a motion and a response to the Greens' motion for summary judgment. When the Lemarrs filed their motion and response, they relied on the deposition of surveyor, Douglas Sutton, who had been asked to survey the property line in 1990. They also filed an affidavit from an original grantee that conflicted with some statements in the Green affidavits. Additionally, Michael Lemarr filed an affidavit alleging that Louis Green had removed boundary markers from the disputed property.

The Greens responded to the summary judgment motion on March 18, 1997. Attached to their response was a field survey done on March 13, 1997, by surveyor, Edward Roach, and photos illustrating the monuments recorded on the survey. Also included was an affidavit from Louis Green, which contradicted the statements made in Michael Lemarr's affidavit. Subsequently, on March 25, 1997, the Lemarrs moved to strike the Greens' response. The Lemarrs were primarily upset because Roach had not been identified as a witness. In response, the Greens claimed that Roach's testimony would be admissible at trial on rebuttal. The Greens also offered to let the Lemarrs depose Roach. The final action regarding summary judgment was Mr. Lemarr's second affidavit, filed on April 23, 1997. In the affidavit, which was also filed beyond the deadline, Lemarr contested the facts set out in the Greens' response. Notably, Lemarr's affidavit said:

"Mike Lemarr * * * does hereby assert * * * [t]hat he is a Defendant in this case, and that he disputes completely the affidavit of Louis A. Green, dated April 4, 1997, and filed herein."

At the Lemarrs' request, a trial set for June 9, 1997, was rescheduled for September 29, 1997. The September trial was then apparently canceled by the court (no entry is in the record). On October 13, 1997, the magistrate filed a decision granting the Lemarrs' motion for summary judgment. In the decision, the magistrate commented that the facts in the case were "undisputed." She then discussed only the Norfleet and Sutton surveys, and found that Sutton's survey was "credible" in locating the disputed boundary line. The basis for this conclusion was that, "as a matter of law, the Sutton survey followed the applicable legal principles of surveying while Norfleet's survey failed to do so." The magistrate did not mention the pending motion to strike, the Roach survey, or any of the conflicting affidavits that had been submitted.

On October 23, 1997, the Greens filed a timely motion under Civ.R. 52 for written findings of fact and conclusions of law. According to Civ.R. 53(E)(3), if a party makes such a request, the magistrate shall include the findings of fact and conclusions of law in an amended magistrate's decision. Civ.R. 53(E)(3)(a) also says that if a request for findings of fact and conclusions of law is made, the time

for filing objections to the magistrate's decision begins to run when the magistrate files a decision including findings of fact and conclusions of law.

Subsequently, on November 26, 1997, the Greens filed a motion to withdraw their motion for findings of fact and conclusions of law. Additionally, the Greens asked for an extension of time of fourteen days to file objections to the magistrate's decision. However, this motion was not necessary, since the time for objections had already been tolled and the magistrate had not yet filed any findings of fact and conclusions of law.

The Lemarrs did not file a timely request for findings of fact and conclusions of law. However, on December 1, 1997, the Lemarrs filed a motion for findings of fact and conclusions of law. They also opposed the Greens' motion to withdraw their request for findings of fact. In particular, the Lemarrs stated that "[t]he magistrate should be afforded a full and complete opportunity to supplement the written record with separate findings of fact and conclusions of law explaining the rationale behind her decision."

Before the magistrate ruled on these motions, the Greens went ahead and filed their objections on December 30, 1997. In response, the Lemarrs filed a motion to exclude the objections as premature and untimely.

Subsequently, on February 19, 1998, the magistrate filed a "supplemental" decision. In this decision, the magistrate noted that her prior decision of October 13, 1997, did not make a specific ruling on the Greens' motion for summary judgment, nor did it adjudicate the Lemarrs' counterclaim for slander of title. Additionally, the magistrate stated that several motions were pending and that none of the motions filed after the motions for summary judgment had been ruled on. However, the only motions that the magistrate mentioned were the respective motions for findings of fact and the motion to exclude the Greens' objections. Specifically, the magistrate made no comment about the motion to exclude the Greens' summary judgment response.

After commenting about the existence of pending motions, the magistrate concluded that the Lemarrs' motion for specific findings was well taken. Unfortunately, despite the magistrate's conclusion, the decision contains nothing that can arguably be construed as separate findings of fact and conclusions of law. Instead, the magistrate simply corrected some procedural errors, like her prior failure to expressly overrule the Greens' motion for summary judgment. She also corrected a factual error in a footnote. The remaining part of the decision then dealt briefly with the counterclaim for slander of title. After granting summary judgment for the Lemarrs on this counterclaim, the magistrate set a hearing on damages for March 23, 1998. Finally, the magistrate said that her decision was interlocutory and that objections would not be considered until after a final adjudication on the issue of damages.

A damages hearing was held on March 23, 1998, and evidence was presented about items of damage like attorney fees, the value of cut wood, and some miscellaneous costs. At the hearing, the magistrate agreed to reconsider her decision on slander of title, and to allow the parties to file supplemental memoranda. Responses and rebuttals to the responses were then filed in April and May 1998. Subsequently, on August 14,1998, the Greens filed a motion to supplement the record. Attached to the motion were various documents relating to a complaint Mr. Lemarr allegedly made to the Ohio State Board of Registration for Professional Engineers and Surveyors about Randy Norfleet's survey. After investigating, the state board found that Norfleet had not violated the minimum standards in the Ohio Administrative Code for boundary surveys. As a result, the board closed the inquiry. The point of this evidence, according to the Greens, was that slander of title could not exist because Norfleet's survey validated the allegations in the affidavit Louis Green had filed with the county recorder. The board's finding was dated June 15, 1998, *i.e.*, it was issued after the hearing on damages, and after the supplemental memoranda were filed.

On August 19, 1998, the magistrate overruled the motion to supplement. She reasoned that the documents were irrelevant because Norfleet's survey was performed after Green had filed his affidavit. Therefore, she concluded that Green could not have relied on Norfleet's survey. In a separate decision issued the same day, the magistrate reaffirmed her prior decision on slander of title and awarded the Lemarrs $602.50 in damages.

On September 2, 1998, both sides filed timely objections to the magistrate's decisions. In October 1998, the parties then filed memoranda regarding the objections they had made. The Greens attached additional evidence to their memorandum, in the form of an affidavit from a title agent and attorney who had performed a title examination. According to this title expert, the affidavit filed by Louis Green did not show up in the Lemarrs' chain of title, did not cast doubt on their title, and did not stand in the way of their full and free exercise of ownership.

Over one year later, on December 10, 1999, the trial court issued a short decision adopting the three reports of the magistrate. The court's only discussion of the substantive objections raised by the Greens was as follows:

"At the outset, the Court notes that much of Plaintiff's argument in support of his objections are [*sic*] based on evidence previously excluded without objection and the attempted introduction of new evidence which was not before the Magistrate."

This was incorrect, for three reasons. First, the magistrate never ruled on the motion to strike, and she never specifically excluded any evidence other than the materials relating to the complaint filed with the board of registration. Second,

the excluded evidence from the board was pertinent, if at all, to the counterclaim for slander of title, not to the "quiet title" action. Third, while the Greens did attempt to introduce new evidence in the form of the title search, that evidence again related only to the counterclaim for slander of title.

After the trial court made the above comments, it then briefly discussed the slander-of-title claim. In this regard, the court found that the Lemarrs did not establish special damages. As a result, the court approved the minimal damages the magistrate had awarded.

■ In addition to the above procedural errors, we are troubled by the conduct of the parties' attorneys. As the Ohio Supreme Court recently noted, some lawyers are increasingly exhibiting a lack of professionalism. See *Nakoff v. Fairview Gen. Hosp.* (1996), 75 Ohio St.3d 254, 256, 662 N.E.2d 1, 3–4. As examples of this regrettable trend, we offer the following items, which we could not help but notice as we reviewed the record:

1. While discovery deadlines were incredibly short, the Greens' attorney still did not list Roach as a witness prior to the cutoff, and did not move for an extension of discovery deadlines. Instead, he simply attached evidence to his response to the summary judgment motion. Evidence attached to the motion to supplement was also not in the proper form required by the Civil Rules;

2. Counsel for the Lemarrs did not appropriately file a request for findings of fact and conclusions of law, and filed a request that was clearly untimely under the Civil Rules;

3. Counsel for the Greens continued to try to "sneak in" evidence after the damages hearing by submitting a report from a title attorney who was never identified as a witness and did not conduct even a title examination until six months after the damages hearing;

4. Even more troubling, counsel for the Lemarrs made unsupported factual and procedural allegations in the trial court and continued to do so on appeal. Specifically, in the Lemarrs' motion for summary judgment, counsel referred to the affidavit of a witness and alleged that she is "in good health, of clear mind, and fully capable of distinguishing between those matters of which she is certain and those of which she is less than certain." However, no evidence of record exists about these "facts." Later in the memorandum, counsel goes on to say, in disputing the accuracy of the Norfleet survey:

"It is regrettably true that Plaintiff's Surveyor, Mr. Randy Norfleet, has been a personal friend of the Plaintiff for years, and I believe, has allowed his friendship and desire to support his friend to overrule his professional objectivity in this case."

There were no facts of record to support these comments. Norfleet was not asked about any relationship during his deposition, and the affidavit of Louis Green, filed after these remarks, indicates that he does not recall ever meeting Norfleet before the first time he discussed the survey in Norfleet's office. The survey was conducted in May 1996, the lawsuit was filed in June 1996, and Norfleet's deposition was taken in September 1996—a matter of about six months. Even after Green's affidavit was filed, counsel persisted (without factual support) in referring to Norfleet as a "close friend" of Louis Green. See Defendant's Response to Plaintiff's Objections, filed on October 19, 1998.

Additionally, counsel for the Lemarrs represented to the trial judge, and has represented to this court on appeal, that the Everett Roach survey was excluded by order of the trial court and without the filing of an objection. We have diligently searched the record, and we cannot find a reference in any trial court order to the Roach survey. Furthermore, since no order existed, the Greens cannot be faulted for failing to file a specific objection. Nonetheless, in objections filed on September 2, 1998, the Greens did specifically raise the magistrate's failure to credit both the Roach and Norfleet depositions. Other examples of counsel's reliance on facts not of record can be found in the trial court file. However, the above examples more than amply illustrate a course of conduct which we find deeply disturbing.

5. Like defense counsel, the Greens' counsel improperly referred to facts not of record. For example, in the memorandum opposing summary judgment, the Greens' counsel argued that an affiant, Betty Beason, had not been on the property for forty years. A similar assertion was repeated in a later memorandum. No evidence of record supports this claim. Likewise, counsel for the Greens referred at length in a memorandum to "customary" land surveying practice, including how a surveyor observes angles between two monuments using instruments. Counsel also mentioned that in 1955, surveyors used tapes to measure distance. These "facts" may be true, but they are not established by any evidence of record.

In addition to the above matters, the actions of the litigants themselves are troubling, including:

1. Louis Green's use of "straw man" deeds to transfer legal title of the disputed property to himself and his wife before this action was filed;

2. Michael Lemarr's repeated calls to the police to report "trespassing" and removal of boundary stakes during the time that possession of the property was in dispute. In this regard, we note that Lemarr attached an April 19, 1997 police report to a request for reconsideration of a motion for restraining order. The police report indicates that the April 1997 report was the sixth report on the

situation in the past twelve months. The other reports attached to the motion ⋅ indicate that Lemarr filed three more police reports in November 1997.

■ Unfortunately, the property has to be awarded to one of these litigants. The issue before us is whether summary judgment was the correct way to make the award. In this regard, probably the only real undisputed fact in this case is that the deed description was erroneous. Douglas Sutton, the surveyor relied on by the Lemarrs, stated that the closure "wasn't worth a darn," and that the deed description was "very erroneous." As written, the deed did not close by about sixty-nine feet. One problem was that the deed contained an obvious repeated call. However, even after the repeated call was taken out, the deed still did not close by about twenty feet.

■ As we mentioned earlier, conflicting survey opinions were presented to the magistrate. The magistrate accepted the survey of the Lemarrs' expert, Sutton, but rejected the survey of the Greens' expert, Norfleet, because she felt that Norfleet failed to follow applicable legal principles of surveying. We disagree with this conclusion for two reasons. First, we have previously stressed that summary judgment is not an appropriate way to resolve credibility issues and conflicts in testimony. *Napier v. Brown* (1985), 24 Ohio App.3d 12, 13–14, 24 OBR 33, 34–36, 492 N.E.2d 847, 849–850, citing *Duke v. Sanymetal Products Co.* (1972), 31 Ohio App.2d 78, 83, 60 O.O.2d 171, 174, 286 N.E.2d 324, 328. As the court in *Duke* observed, credibility "questions should be left to the trier of facts who have the opportunity to observe the demeanor of the witnesses. *Only through a visual presentation of the testimony can the jury, or the trial court, filter out any bias that may have subtly manifested itself in the depositions.*" (Emphasis added.) 31 Ohio App.2d at 83, 60 O.O.2d at 174, 286 N.E.2d at 328. See, also, *Fairfield Cty. Commrs. v. Merritt* (Apr. 14, 1999), Fairfield App. No. 98CA64, unreported, 1999 WL 253616 (holding that where two experts presented conflicting testimony about location of a boundary line, the ultimate decision must be made by the trier of fact at trial, not at a hearing on a motion for summary judgment).

■ Consequently, because the testimony of Sutton and Norfleet conflicted, summary judgment was not the proper vehicle for resolving the issues. Furthermore, we disagree that Norfleet failed to follow applicable legal principles of surveying as a "matter of law."

Minimum standards for boundary surveys have been established by the Ohio State Board of Registration for Professional Engineers and Surveyors. See Ohio Adm.Code Chapter 4733–37. The rules in this chapter were adopted based on statutory powers given to the board by R.C. 4733.07. Although authority interpreting the regulations is sparse, one court has held that the minimum

boundary standards are "valid rules promulgated pursuant to the Board's implied power." *Satterfield v. Ohio State Bd. of Registration For Professional Engineers & Surveyors* (May 20, 1999), Adams App. No. 98CA670, unreported, 1999 WL 339234, at 6.

Ohio Adm.Code 4733–37–01 indicates that the rules adopted by the board are "intended to be the basis for all surveys relating to the establishment or retracement of property boundaries in the state of Ohio." Regarding research and investigation, Ohio Adm.Code 4733–37–02 provides:

"(A) When the deed description of the subject property and the deed descriptions of adjoining properties do not resolve the unique locations of the corners and lines of the property being surveyed, the surveyor shall consult other sources of information in order to assemble the best possible set of written evidence of every corner and line of the property being surveyed. These sources include, but are not limited to: records of previous surveys, deed descriptions of adjacent properties, records of adjacent highways, railroads and public utility lines; also include subdivision plats, tax maps, topographic maps, aerial photographs, and other sources as may be appropriate.

"(B) After all necessary written documents have been analyzed, the survey shall be based on a field investigation of the property. The surveyor shall make a thorough search for physical monuments, analyze evidence of occupation and confer with the owner(s) of the property being surveyed. In addition, the surveyor shall, when necessary, confer with the owner(s) of the adjoining property and take statements."

These standards have been in effect since 1980. As was indicated above, the deed description was admittedly erroneous and did not resolve the location of the property line. In his deposition, Norfleet testified that he and his survey crew went through a series of different procedures to find out if there was one particular bearing which would cause the survey not to close. Based on all the possible combinations, they felt no good legal description existed. As a result, they did what they had always done under boundary law, *i.e.*, they looked at anything that would show the intent of the parties when the survey was done.

Norfleet and his survey crew had a package of information, including current and prior deeds for the Greens' property, plat surveys, auditor maps, and surrounding deeds (including the Lemarr property deed). Additionally, they had the field notes of Ben Pierce, who originally surveyed the property in August 1955. Norfleet did not find a formal, filed survey from Pierce, as Greene County did not require surveys to be filed in 1955. The deed itself referred to the Ben Pierce survey of August 14, 1955, and the field notes bore the same date. Accordingly, Norfleet felt that the survey notes were the most accurate information available which was done at the time of the original survey. Norfleet was

not aware that Douglas Sutton had done a survey of the boundary line in 1990 (Sutton had never filed his survey).

The above procedure is consistent with Ohio Adm.Code 4733–37–02, which indicates that other sources of information shall be consulted when deeds do not resolve a boundary line. Norfleet's team also did a field investigation and searched for monuments. The survey did not take just the Green property into consideration but also used twenty to twenty-five points (railroad spikes and iron pins) from surrounding properties to help pinpoint where the Green property should start and end. Again, this procedure was consistent with the requirements of Ohio Adm.Code 4733–37–02.

Pierce's survey notes showed a 159′ call along Gultice Road (as opposed to a 139′ call in the deed). Norfleet used this call rather than the one shown in the deed. Due to the twenty foot difference, the property line ended up on the east side of the ditch or channel, rather than the west side, as reflected in the deed. However, in contrast to the deed, Pierce's notes also indicated that pins were set on the east side of the ditch, not on the west.

According to the survey notes, a railroad spike was set on a bridge at the end of the 159′ call. Norfleet's team did not find a railroad spike, but they did find two concrete survey nails at about the 159′ mark. Because the bridge was no longer there and had been replaced with a culvert, Norfleet assumed that the points were replaced after the culvert was constructed. From that point on, Norfleet did not find any further monuments. He proceeded down the east side of the creek, following the measurements in the field notes, and basically ended up having to add about ten feet to allow the deed to close.

By the time of his deposition, Norfleet had read the affidavit of Betty Beason, who was one of the original grantees of the Green property. Beason's affidavit indicated that the property line was supposed to be on the west side of the ditch. Beason also recalled a fence on the west side of the ditch that may or may not have been exactly on the property line. Norfleet said that Beason's affidavit could hold some importance, but he could not really say because he had not talked to her and did not know her physical or mental state. He also stressed that no physical evidence was found in the field to verify Beason's statement, and that physical evidence was found to verify the correctness of the 159′ call.

In view of the above evidence, we do not think one could conclude as a matter of law that Norfleet failed to follow acceptable principles of surveying.

As we mentioned earlier, the Beasons owned the 1.2-acre parcel for about a year and a half and conveyed it to the Bartons. The Bartons then owned the property for two more years before conveying it to the Green family in 1959. Since that time, the property has been owned by a member of the Green family.

In contrast to Beason's affidavit, affidavits from Green family members indicated that the tract they purchased included a rock-walled channel (also known as the ditch or stream). The original grantor, John Bocklet, regularly occupied a small cottage located on the east side of the channel and observed the Greens many times clearing debris from the channel, crossing it, and mowing the lawn on the east side of the channel. The Greens also testified that no fence was ever located on the west side of the ditch. Instead, Bocklet and others erected a wire fence eight to ten feet east of the channel. Additionally, the Greens' affidavits indicated that neither Bocklet nor any adjoining property owner disputed the Greens' ownership of the channel, and no one ever asserted a contrary claim.

In 1990, Doug Sutton surveyed the boundary line for Richard Bull, the predecessor in title to the Lemarrs. As we mentioned, the Sutton survey was not recorded. Sutton also did not have Pierce's field notes. Basically, Sutton used the measurements in the deed, disregarded the repeated call, and assumed that another erroneous call (of 75.8′ to a twelve-inch walnut tree) contained a typographical error and should have been 95.8 feet instead. Using these assumptions, Sutton eventually closed his survey within three inches of the original deed.

Basically, both Sutton and Norfleet agreed on the property lines up to Gultice Road. At that point, Sutton used the deed call of 139′ to a railroad spike. However, Sutton did not find the railroad spike called for in the deed. Because Sutton used the 139′ distance, the property line ended up on the west side of the creek.

Again, following the measurements in the deed, Sutton found two iron pipes at the distances mentioned in the deed. Sutton described these pipes as "[j]ust an iron pipe driven in the ground. One inch probably, maybe. I don't know. I'd have to look at my notes, see if it even said." The deed does not refer to iron pipes. Instead, it says "iron pins."

As a potential explanation for this discrepancy, the Lemarrs submitted the affidavit of Nathan Burr, who worked with Pierce, although not until around two years after the survey in question. Burr indicated that Pierce occasionally used iron pipe to mark positions referred to in his descriptions as "iron pins."

The third surveyor, Edward Roach, found existing wire fence on the east side of the channel. He also found two iron pipes next to concrete slabs on the west side of the channel and one iron pipe on the east side of the channel. These iron pipes were about twenty feet from the pipes Sutton found. However, Roach did not find the pipes mentioned in the Sutton survey. An affidavit from Louis Green indicated that the concrete slab and pipes were part of a bridge Green's father built across the creek. Green also indicated that in 1994 (or about three years before Green's April 1997 affidavit), Mr. Lemarr pointed these pipes out to him as the boundary lines of the property. Mr. Lemarr disputes this, of course,

and indicated in an affidavit that the two iron pipes he pointed out to Mr. Green were, in fact, the two pipes which Sutton found. Additionally, Lemarr contends that the two pipes or posts have since been removed—allegedly by Mr. Green.

During his original visit to the property, Sutton also did not find a twelve-inch walnut tree at the location described in the deed, *i.e.*, 75.8 feet from the last iron pin. After calculating places to look based on the monuments and angles, Sutton later found a fifteen-inch walnut stump at 95.8 feet and at a slight degree deviation from the angles listed in the deed. He, therefore, assumed that a typographical error existed in the deed and that the walnut tree he found was the twelve-inch walnut tree referred to in the deed. The 95.8' distance does correspond with the figure in Pierce's field notes, but not the deed. Pictures of the site show many walnut trees on the property.

Clearly, this is a case of disputed material facts if ever one existed. Undoubtedly, the parties induced the error somewhat by filing cross-motions for summary judgment. Nonetheless, based on the circumstances outlined above, the blame for the error cannot be placed just on the appealing party. Even more unfortunate, litigation costs to date have probably exceeded the value of the land, even taking into consideration the grove of walnut trees that the parties are apparently fighting over. However, this is the price the parties will have to pay for their actions and those of their attorneys. In view of the obvious trial court error and many factual disputes, we are compelled to find that the grant of summary judgment was improper.

Based on the preceding discussion, the first two assignments of error are sustained. This case will be reversed and remanded for trial of all issues.

## II

The third assignment of error is based on the Greens' contention that Sutton's survey failed to comply with the requirements of R.C. Chapter 4733 and Ohio Adm. Code Chapter 4733. In particular, the Greens claim that Sutton failed to comply with Ohio Adm. Code 4733.–37–02 because he did not locate Pierce's prior survey, did not review descriptions of adjoining properties, and did not find certain monuments located by the other surveyors. The Greens additionally argue that Sutton relied too heavily on mathematical calculations designed to close the property description, rather than looking for monuments. Based on these alleged deficiencies, the Greens believe the trial court should not have relied on Sutton's survey.

In view of the preceding discussion, this assignment of error is moot. As we said, the surveys conflict. On remand, the trial court will have a chance to judge the credibility of all surveyors, after hearing them personally testify.

## III

The fourth and fifth assignments of error and the two cross-assignments of error deal with the judgment the Lemarrs received on the slander-of-title counterclaim. Because the case is being reversed and remanded for a full trial on the merits, these assignments of error are moot. However, for purposes of remand, we make the following observations about the correct standards for slander of title.

The slander-of-title claim arose from the affidavit Louis Green filed with the Greene County Recorder. As we mentioned earlier, Green's affidavit stated that the deed conveying the 1.20-acre parcel was erroneous and did not conform to the intent of Pierce's original "survey" of August 13, 1955. Green also pointed out various discrepancies between the deed and survey, including the fact that the survey placed the property line on the east side of a stone-walled channel, while the deed placed the same courses and distances on the west side of a ditch. Green's affidavit was filed on May 3, 1996, and the Norfleet survey was performed and recorded shortly thereafter. The Greens then transferred their property to two trustees, who transferred the property back, with the new legal description.

In the fifth assignment of error, the Greens contend that Mr. Green cannot be guilty of slander of title because his affidavit was statutorily authorized by R.C. 5301.252. Additionally, the Greens say that malice cannot exist because two other surveyors, Norfleet and Roach, agreed with Green about the location of the property line. The fourth assignment of error contests the magistrate's decision to exclude the evidence of Norfleet's compliance with minimum standards for boundary surveys. As we mentioned earlier, the magistrate found this particular evidence irrelevant because Norfleet's survey was done after Mr. Green's affidavit was filed.

By contrast, the cross-assignments of error deal with the trial court's failure to award full attorney fees and to allow recovery of "special damages" relating to the removal of timber and boundary markers from the disputed property.

Slander of title is a tort action which may be " 'brought against any one who falsely and maliciously defames the property, either real or personal, of another, and thereby causes him some special pecuniary damage or loss.' " (Citation omitted.) *Buehrer v. Provident Mut. Life Ins. Co. of Philadelphia* (1930), 37 Ohio App. 250, 256, 174 N.E. 597, 599, affirmed (1931), 123 Ohio St. 264, 175 N.E. 25. To prevail, a claimant must prove "(1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard of its

falsity; and (4) the statement caused actual or special damages." *Colquhoun v. Webber* (Me.1996), 684 A.2d 405, 409.

Typically, slander-of-title cases involve documents filed against a particular piece of property by parties who claim an interest in the property. Specific examples would include mortgage holders, parties who have judgment liens, or parties who may have signed contracts to purchase or lease the property. Generally, the claim arises because the presence of the affidavit or other filed document prevents the titled owner from completing a proposed sale. For example, in *Childers v. Commerce Mtge. Investments* (1989), 63 Ohio App.3d 389, 579 N.E.2d 219, a mortgage company purchased and then recorded a mortgage even though it knew the lender had not disbursed the mortgage money to the plaintiffs. Subsequently, the mortgage company refused to cancel the mortgage and the plaintiffs were not able to sell the property because of the cloud on the title. *Id.* at 390, 579 N.E.2d at 220. Ultimately, the mortgage company was found liable for slander of title.

Likewise, in *Wendover Rd. Prop. Owners Assn. v. Kornicks* (1985), 28 Ohio App.3d 101, 28 OBR 198, 502 N.E.2d 226, a property owners' association filed affidavits under R.C. 5301.252 against three property owners who did not pay their proportionate share of road improvements. *Id.* at 101, 28 OBR at 198–199, 502 N.E.2d at 227–228. One owner sold his property and counter-sued the association for slander of title because $15,000 of the purchase price was held in escrow pending resolution of the association's lawsuit to recover the cost of the improvements. *Id.* at 102, 28 OBR at 199–200, 502 N.E.2d at 228.

Similarly, in *Madden v. Muth* (Aug. 26, 1981), Columbiana App. No. 80–C–41, unreported, 1981 WL 4769, the plaintiffs and defendants entered into a purchase agreement for property. The defendants refused to close the transaction and the plaintiffs sold the property to another party. When the defendants learned of the pending sale, they filed an affidavit under R.C. 5301.252, claiming that they had an interest in the real estate because of the purchase agreement. *Id.* at 1. Subsequently, plaintiffs filed an action to quiet title and for slander of title. *Id.* at 2.

■ The affidavit filed by Mr. Green was authorized by R.C. 5301.252. This statute lets any person with knowledge of facts pertaining to possession of real estate, location of monuments, and so on file an affidavit with the county recorder in the county where the real estate is situated. The affidavit itself is not an instrument that casts doubt on the property's title and does not stand in the way of a record owner's "full and free exercise of * * * ownership." *Catawba West, Inc. v. Domo,* (1991), 75 Ohio App.3d 80, 83, 598 N.E.2d 883, 885. The magistrate in the present case acknowledged that filing a statutory affidavit does not normally create a cloud on a title. However, relying on a prior unreported

decision from our district, the magistrate found that an action for slander of title is possible under circumstances where the affidavit does create a potential cloud on the title. See *Carman v. Entner* (Feb. 2, 1994), Montgomery App. No. 13978, unreported, 1994 WL 28633.

*Carman* involved a dispute between adjacent landowners over an easement. In that case, the plaintiffs owned a dominant estate which received utility service through utility lines located on the servient estate. An express easement and survey had been recorded, but the surveyors drew the path of the easement outside the actual location of the utility lines. *Id.* at 1. No one discovered the mistake until the defendants learned of a pending sale of the dominant estate. When the plaintiff refused to pay for removing the utility lines, the defendants filed an affidavit with the county recorder, alleging that the easement was mislocated. They also threatened in the affidavit to revoke use of the easement. *Id.* at 2. As a result, the sale fell through and the plaintiffs brought an action for slander of title and tortious interference with contractual relations. *Id.*

At the beginning of our analysis of the slander-of-title claim, we noted, citing *Catawba,* that the filing of an affidavit under R.C. 5301.252 does not support an action to quiet title or to remove a cloud on title. *Id.* at 6. We then said, however, that "when such an affidavit creates a potential cloud on title, an action for slander of title may be brought by the aggrieved owner of the property described in the affidavit. Also, nothing in *Catawba* prevents an action from being brought for tortious interference with contract." *Id.* After considering the content of the affidavit, we decided that the defendants had a privilege to file the affidavit, for two reasons: (1) the assertion of a location error in the easement was partly true, and (2) the defendants had an interest in protecting themselves from a future finding of acquiescence in the easement's location. Accordingly, we found that the defendants could not be liable for slander of title. *Id.*

We then considered the issue of tortious interference with contract. In this regard, we were disturbed by the defendants' implied threat to the use of the easement. We noted that a privilege to interfere with a contract "arises if there is a 'bona fide doubt' as to the remote party's rights under the contract." (Citation omitted.) *Id.* at 7. Specifically, "where there is no need to interfere with a contract to protect a genuine legal right, even truthful statements, calculated to interfere with the contract, are actionable. The exception is where the interfering party has a bona fide belief that the contract will impair or destroy his genuine legal rights." *Id.*

Again, we found that because the defendants needed to give notice of the location error and their intent to seek reformation, any interference from those statements was not actionable. *Id.* at 8. On the other hand, we decided that the defendants had exceeded their privilege by threatening the use of the easement,

and by refusing to take corrective action about the affidavit when they were told it would interfere with the potential sale. In this context, we said:

"[T]he * * * [defendants] cannot credibly argue that they were exercising a legal right in interfering with the contract. Once their right to notify * * * [plaintiff] of the location error was exercised, the * * * [defendants] had no further need to do any act or maintain any posture that they knew or should have known would interfere with the contract. After the affidavit was first filed, the * * * [defendants] were given the opportunity to withdraw their threat, and failed to do so. At bare minimum, the refusal of the * * * [defendants] to withdraw the unprivileged threat between the first and second closing was an unjustified interference with the contract, since at that point in time, the * * * [defendants] had no remaining interest in the contract. However, we do not think that the privilege to assert a right provides a co-extensive privilege to make an otherwise unprivileged threat." *Id.*

In view of the above analysis, we reversed the judgment against the defendants for slander of title but affirmed the judgment against them for tortious interference with contractual relations. *Id.* at 10.

The present case involves somewhat different facts than *Carman* and is unique compared to typical situations involving use of a statutory affidavit. Specifically, Mr. Green's affidavit did not even mention or identify the Lemarr property and was not filed as an affidavit on the Lemarr property. Instead, Green filed the affidavit about his *own* property. As a result, we do not think the Greens could be held liable merely for filing a statutory affidavit about their own property.

However, as in *Carman,* related issues exist concerning whether the Greens' actions in filing a quitclaim deed to a "straw-man" and receiving a deed back went beyond their statutory privilege. We have not been able to find Ohio law on this specific point, but other jurisdictions have found liability for slander of title where a party claims title in himself without any reasonable basis. See *TXO Production Corp. v. Alliance Resources Corp.* (1992), 187 W.Va. 457, 466, 419 S.E.2d 870, 879, affirmed (1993), 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366. In *TXO,* a jury found the defendant liable for recording a quitclaim deed that it knew to be frivolous, and the West Virginia Supreme Court affirmed. Specifically, the West Virginia Supreme Court said:

"[R]ecording a quit-claim deed that one knows to be frivolous is no different from saying to a potential purchaser—'I don't think you should buy that land. You know there is a cloud on the title * * *.'

"* * *

"As a general rule, courts have found that wrongfully recording an unfounded claim to the property of another is actionable as slander of title. * * * This is

so provided that the other elements for slander of title, namely malice and special damages, are present." 187 W.Va. at 466–67, 419 S.E.2d at 879–880. See, also, *Colquhoun v. Webber* (Me.1996), 684 A.2d 405 (finding defendant liable for filing frivolous quitclaim deed during pendency of quiet title action).

Based on the above authority, we think the Greens could be held liable if they frivolously filed the quitclaim deed and took a deed back, as long as the remaining elements for slander of title, *i.e.*, malice and special damages, are also proven. Again, these are factually disputed matters that must be resolved through the trial process. In this regard, an additional point is important.

■ As we mentioned earlier, the magistrate rejected evidence about the state board's investigation of Norfleet's survey. The basis for rejection (other than the Greens' failure to properly authenticate documents) was relevance. Specifically, because the survey was prepared after Green filed his affidavit, the magistrate did not feel that Norfleet's survey was relevant to Mr. Green's state of mind. We disagree. As we said, the affidavit itself did not affect the Lemarrs' title. What did potentially cloud the Lemarrs' title was the new legal description contained in the deed back from the trustee. In this regard, we note that Norfleet's survey was recorded on May 29, 1996, and the quitclaim transaction took place thereafter, on June 3, 1996. Consequently, the fact of a supporting survey is directly relevant to the issue of whether the Greens claimed title in themselves without a reasonable basis. We express no opinion on the admissibility of the board's investigation and report, or the weight, if any, to be given to this evidence. The magistrate excluded the evidence for other reasons and no one has addressed the issue of whether the evidence is otherwise admissible.

■ The final point which should be discussed is the question of proper damages. After hearing evidence, the magistrate allowed attorney fees only for the period of time between May 3, 1996 (when the affidavit was filed with the county recorder) and June 14, 1996 (the date the Greens filed their complaint to quiet title). As a basis for this decision, the magistrate commented that the remaining expenses and costs related directly to the Greens' quiet title action or were indistinguishable from expenses flowing from the filing of the affidavit. Subsequently, in adopting the magistrate's decision, the trial court found that the Lemarrs had not shown special damages, because the expenses of defending the quiet title action and prosecuting the slander of title claim were indistinguishable. We do not think these were correct reasons for refusing to award damages.

In *Childers*, the court indicated that plaintiffs in slander-of-title cases may recover only for "special pecuniary loss." 63 Ohio App.3d at 392, 579 N.E.2d at 221–222. "Recoverable pecuniary loss" was defined as " '(a) the pecuniary loss that results directly and immediately from the effect of the conduct of third

persons, including impairment of vendibility or value caused by disparagement, and (b) the expense of measures reasonably necessary to counteract the publication, including litigation to remove the doubt cast upon vendibility or value by disparagement.'" *Id.* at 393, 579 N.E.2d at 222, quoting from Restatement of the Law 2d, Torts (1977) 355, Sections 633(1)(a) and (b).

Attorney fees would obviously be included within expenses reasonably necessary to counteract a disparaging publication, but *Childers* did not specifically discuss the issue of fees. Other Ohio cases are also of limited help. For example, in *Carman*, substantial attorney fees were awarded, but the only claims involved in the case were the plaintiffs' claims for slander-of-title and tortious interference. Moreover, the judgment on slander-of-title was reversed, meaning that attorney fees would be available only as a result of the tortious interference claim.

The majority rule on special damages in slander-of-title actions is that "an aggrieved party has the right to recover as special damages the litigation expenses incurred in removing the effects of the slander, even in the absence of an impairment of vendibility." *Colquhoun*, 684 A.2d at 410. The court also noted in *Colquhoun* that "the costs of litigation and attorney fees in the action for slander of title itself cannot constitute the required special damages. * * * The prevailing party in a slander of title action may recover as special damages those attorney fees and expenses incurred to remove the cloud on title but not those incurred to prosecute the slander of title action." (Citations omitted.) *Id.* at 411.

Two reasons were given for this holding. First, the court commented that the costs of prosecuting a slander of title action are not "expenses reasonably necessary" to counteract the disparaging publication. *Id.* at 413, citing Prosser & Keeton on Torts (5 Ed. 1984), Section 128, and Restatement of the Law 2d, Torts (1977) 355, Section 633(1)(b). Second, the court believed that an award of such fees violates the "American Rule," which requires litigants to bear their own attorney fees and litigation costs "absent a statutory provision or contractual agreement." *Id.*

Ohio follows the American Rule. Notably, an exception to the American Rule exists "when the party against whom attorney fees are sought to be taxed is found to have acted ' * * * in bad faith, vexatiously, wantonly, obdurately, or for oppressive reasons,'" or in cases of torts involving malice, where punitive damages are found to be warranted. *Farmers State Bank & Trust Co. v. Mikesell* (1988), 51 Ohio App.3d 69, 86, 554 N.E.2d 900, 915. See, also, *Vance v. Roedersheimer* (1992), 64 Ohio St.3d 552, 556, 597 N.E.2d 153, 156–157.

The bad faith exception was not discussed in *Colquhoun*. Therefore, we think, in a proper case, a party could recover the attorney fees incurred in removing a cloud on title as "special damages," and could also recover attorney fees for

prosecuting a slander-of-title action. The latter fees would not be included in "special damages" but would arise from a finding of bad faith. Consequently, the magistrate incorrectly concluded that the Lemarrs could not recover costs related to the quiet title action. These were precisely the type of special damages which were appropriate.

Furthermore, we are perplexed by the magistrate's decision to award fees only for the short period (less than six weeks) between the filing of Mr. Green's affidavit and the filing of the Greens' complaint to quiet title. As we said, we disagree that attorney fees are proper only for actions taken with regard to the slander-of-title claim. However, even if we agreed on this point, the effect of the magistrate's decision was to allow fees for a period of time when the Lemarrs had not even been served with the complaint to quiet title. Specifically, the fees which were awarded would not even cover the time counsel spent drafting the counterclaim for slander of title.

■ The remaining damages which the Lemarrs have mentioned on appeal are expenses associated with the Greens' alleged removal of timber from the disputed property and the cost of restoring missing boundary markers. As we read Section 633 of the Restatement of Torts and the comments to that section, "special damages" would not include these items. Specifically, the matters discussed in Section 633 and the comments are losses that directly result from the disparaging publication. For example, the publication may prevent the sale of the property to a particular purchaser, or may cause a potential purchaser to offer less for the property. See, Section 633, Comments (c) through (j). The point is that the alleged items of damage may be recovered under some other theory, but they are not appropriate damages for slander of title.

In view of the preceding analysis, assignments of error one and two are sustained. The remaining assignments of error and the two cross-assignments of error are moot. The judgment of the trial court is, therefore, reversed, and this case is remanded for further proceedings consistent with this opinion. ·

*Judgment reversed*
*and cause remanded.*

WOLFF and FREDERICK N. YOUNG, JJ., concur.