OPINION
This case involves a breach of contract claim based on kitchen cabinets that were allegedly ordered in an incorrect size. In March, 2000, Plaintiffs-Appellees, Anthony and Cheryl Bulcher, were building a home and needed to purchase some items like flooring, carpet, and cabinets. The Bulchers wanted to save money on their building allowance, and were coincidentally solicited just then by Defendant-Appellant, Prime Time Marketing Management, Inc., dba UCC Total Home of Dayton (UCC). UCC is a national organization that provides members with the ability to purchase direct from manufacturers at wholesale cost. UCC makes money strictly through membership fees and renewal fees, and does not receive a percentage of costs consumers pay for products.
Once members pay the enrollment fee ($2,490), they can come to UCC's showroom, look through manufacturer's catalogs, and order products at the wholesale price. Products are delivered to the UCC shipping dock, where they are inspected by UCC Member Service Representatives (MSRs). UCC then delivers products to members, if necessary, or products may be picked up at the showroom. After the first two years, if a member wishes to renew, the charge is $159 per year. This renewal fee is effective for eight years. At the end of that time, members may renew each year by paying the prevailing renewal rate.
Upon learning that UCC could potentially save them thousands of dollars on products for their new home, the Bulchers decided to visit the showroom. At that time, they showed UCC owner, Dell Craaybeck, a kitchen layout plan they had obtained from a local building retailer. Craaybeck told the Bulchers they could save at least a couple thousand dollars on the kitchen cabinets. However, Craaybeck also stressed that if the Bulchers did not enroll that day, they would not be allowed to join UCC.
Although the Bulchers had various items to purchase, one of their primary concerns was obtaining cabinets for the house. When the Bulchers visited the showroom, they were given a booklet that said UCC had specialists to help people out. They were also taken to a room where a cabinet specialist (Gabe Irwin) was located. Irwin looked at their cabinet estimate, which was for a particular manufacturer (Birch), and said there would be no problem in saving thousands of dollars off the quote.
Based on the above discussions, the Bulchers paid the $2,490 fee and joined UCC. They then made an appointment to meet with Irwin for a quote on cabinets. Unfortunately, the quote Irwin furnished was for only $700 or $800 less than the retail quote the Bulchers already had. Irwin then told the Bulchers about another line of cabinets (Brookwood), which was similar to Birch. Irwin said he would convert the numbers from Birch to Brookwood so that everything would be the same as the layout in the retail quote. Among the specifications in the layout was that all cabinets were to be 36 inches tall.
Around the middle of June, 2000, the order was ready, and the Bulchers signed off on it. The order included cabinets for their entire home, for a total purchase price of $6,711.37. List price (manufacturer's suggested retail price) for the same items was $18,684.35. The list price is not necessarily the price at which retailers will sell products, but is simply the highest price any retailer can charge.
When the cabinets were delivered to the Bulchers' home, two cabinets (a storage cabinet with apothecary or console drawers and a wall plate rack), were only 30 inches tall, whereas the rest of the cabinets were 36 inches tall. Neither the order form that the Bulchers signed nor the quote they were given indicates the dimensions of various cabinets. Some products do have codes that indicate width and height. For example, the wall plate rack is listed on the quote as "WPR3030." The letters "WPR" stand for wall plate rack, and the numbers mean that the rack is 30 inches wide and 30 inches tall. However, the Bulchers were not familiar with these codes.
Although UCC was contacted about the problem, the parties were unable to resolve the issue. As a result, the Bulchers filed this lawsuit, asking damages for breach of contract. UCC took two positions at trial first, that it was not contractually required to provide assistance to customers, i.e., UCC maintained that customers are responsible for the correctness of their own order. UCC also claimed that Irwin told the Bulchers the cabinets they wanted were not available in 36 inch size, and would have to be custom-ordered. The Bulchers denied this, of course.
After hearing testimony, the magistrate found for the Bulchers and awarded damages of $2,293. Subsequently, the trial court adopted the magistrate's decision. UCC now appeals the decision, raising the following assignment of error: "[t]he trial court erred in granting the Plaintiffs/Appellees a judgment as a result of the trial in this matter (December 20, 2001 Decision Judgment Entry Overruling Defendant's Objections to the Magistrate's October 23, 2001 Decision Judgment Entry)."
After reviewing the record, we find the assignment of error has partial merit. Accordingly, we will affirm the trial court's judgment as to liability, and reverse as to damages. This case will, therefore, be remanded to the trial court for further disposition on damages.
 I
In its single assignment of error, UCC raises two issues. The first deals with liability and involves UCC's assertion that it did not breach the contract with the Bulchers. Specifically, UCC claims that the Bulchers were aware that they ordered 30 inch cabinets. UCC also says the Bulchers were solely responsible at all times for the content of their order. We disagree with both contentions.
As an initial point, we note that credibility decisions belong to the trier of fact, who has the best opportunity to observe the demeanor of witnesses. See, e.g., Green v. Lemarr (2000), 139 Ohio App.3d 414, 425. Given the conflicts in testimony that we have outlined, it is obvious that the magistrate believed the Bulchers, not the UCC witnesses. We cannot say this was an abuse of discretion, since evidence in the record supports the Bulchers' testimony. See State v. Walker (1978),55 Ohio St.2d 208, 212 (credibility is question of fact to be determined by trier of fact and reviewing court should not substitute its judgment for trier of fact). We might add that we did not find the UCC testimony particularly convincing, especially in regard to UCC's disclaimer of any special services that were offered to customers.
As we mentioned, when the Bulchers contracted with UCC, they were told that UCC had specialists to help customers. The Bulchers were also introduced to UCC's "cabinet specialist," who would save them thousands of dollars, and would also work up a quote, based on the layout they provided. These representations were clearly intended to persuade the Bulchers to pay the rather substantial fee for joining UCC.In addition to the oral representations, the membership booklet contained numerous statements about services and the benefits of membership. For example, the booklet touts various advantages of joining UCC, including "savings," "selection," "convenience," "quality control inspections," and "outstanding personal service." Concerning "outstanding personal service," the booklet says that:
 "Our Member Service Representatives (MSRs) are trained to help our members find the things they are looking for and make ordering as simple and efficient as possible. They can help with everything from the simplest piece of product information to assisting with complex special custom orders. MSRs keep current and knowledgeable on all the very latest products and services available through the Club. Their job is to enhance your shopping experience and allow you to take full advantage of your shopping power!"
According to UCC owner, Craaybeck, the MSR role is limited to data entry and does not include independent decisions or any type of actual advice to customers. However, this interpretation is inconsistent with what the Bulchers were told and with the clear implications of the membership booklet.
"Generally, a breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach."
Textron Fin. Corp. v. Nationwide Mut. Ins. Co. (1996),115 Ohio App.3d 137, 144 (citations omitted). In the present case, the Bulchers entered into a binding contract with UCC that included personal service or help finding products that would fit their existing kitchen layout at a reduced price. Clearly, the Bulchers were not experts at reading manufacturer codes and matching products to an existing layout; that role was fulfilled or should have been fulfilled by Irwin, who was UCC's "kitchen designer" and "cabinet specialist." When Irwin specified an incorrect size of cabinets, he breached the contract, and damaged the Bulchers. Accordingly, the magistrate and trial court correctly found that UCC breached the contract.
In its brief, UCC claims the magistrate erred by relying on Ex. J, which is a design layout showing cabinets that are 36 inches in height. UCC points out that Ex. J is not the layout that was allegedly reviewed by the Bulchers when they placed their order. Instead, the layout that they reviewed showed the two cabinets to be only 30 inches tall.
UCC's interpretation of the magistrate's decision is not entirely correct. The magistrate did not say that he relied on Ex. J. To the contrary, the magistrate simply made the following observation about UCC's position:
 "Defendant states that Gabe [sic] Erwin had these discussions with Plaintiffs [about the need to custom order] while reviewing Defendant's Ex. `J' the design drawing with size specifications for each cabinet. However, a brief review of Defendant's Ex. `J' clearly indicates and shows the two [2] cabinets in question as being thirty-six inches (36") tall not thirty inches (30")."
The testimony of the Bulchers indicates that they were never told that 36 inch cabinets had to be custom-ordered, and that they did not review an overhead layout when they signed the order for the cabinets. Since the magistrate clearly believed the Bulchers, the content of any particular layout would be irrelevant. What we think the magistrate meant by the above comments was that even the layout Irwin allegedly reviewed (Ex. J) did not support his testimony, since the cabinets on Ex. J were 36 inches tall.
In contrast to the Bulchers, Irwin testified that the Bulchers knew two cabinets would be shorter than the rest and that only custom-orders for 36 inch cabinets were available. Irwin could not recall when this point was discussed, but said it would have been sometime before the order was finalized. Since Ex. J was the only layout offered by UCC, it was not unreasonable for the magistrate to believe that Ex. J was the layout Irwin reviewed when he allegedly told the Bulchers about the need for a special order. We might add that Irwin's testimony was contradictory. Irwin first claimed that the Bulchers would have reviewed Ex. J before they signed off on the order, and that it looked like they did not object to anything. The implication of this testimony is that Ex. J supports UCC's claim that the Bulchers knew the cabinets were not the correct size. However, as the magistrate noted, Ex. J specifies 36 inch cabinets. Thus, to the extent that Ex. J indicates anything, it does not support UCC's position.
Later in his testimony, Irwin indicated that Ex. J was an addition to the layout the Bulchers reviewed when they looked at the final quote, and was not the document the Bulchers ordered from. Instead, Ex. J was for a different cabinet line (the Legacy). Irwin claimed he had given UCC's lawyer the layout for the cabinets that were actually ordered and installed. However, no such document was ever introduced at trial. Presumably, if such a document existed, and was favorable to UCC, UCC would have offered it at trial. In other words, if a layout existed that showed 30 inch cabinets, UCC would have given it to the court.
In view of the above discussion, we find no error in the findings of the magistrate and trial court as to liability. Accordingly, this part of the first assignment of error is overruled.
 II
UCC's second argument in support of the first assignment of error is that the damages award was not supported by the evidence. The damages award was $2,293, which the magistrate classified as the cost to the Plaintiffs for the non-conforming cabinets.
"Generally, a party who has suffered damages as a result of a breach of contract is entitled to his `expectation interest,' or `his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.'" Nilavar v.Osborn (2000),137 Ohio App.3d 469, 494, citing Restatement of the Law 2d, Contracts (1981) 102-103, Section 344. Decisions on damages are also "within the discretion of the trial court, and will be sustained if * * * [they are] supported by sufficient credible evidence and * * * [are] not against the manifest weight of the evidence." Amerifirst Savings Bank ofXenia v. Krug (1999), 136 Ohio App.3d 468, 487.
As proof that the damage award is incorrect, UCC notes that $2,293 represents the highest retail value of the cabinets and is not what the Bulchers paid. Because only a fraction (.26) of the retail price is paid when customers ordered this particular cabinet line through UCC, the most that the Bulchers would have actually spent on the cabinets was $336.96 for the console cabinet and $259.22 for the wall plate rack, i.e., a total of $596.18. In response, the Bulchers claim that their expectation at the time of the contract was that the kitchen cabinets would be of equal height. They argue that they may have to pay more than the retail cost of the non-conforming cabinets to cure the defect. As a result, the Bulchers contend that the retail value of the non-conforming cabinets ($2,293) is an appropriate award.
As we mentioned earlier, the final UCC quote (Ex. 6) shows a retail value of $18,684.35 for all cabinets in the Bulcher home. However, the Bulchers paid only $6,711.37 for all the cabinets listed in the quote. Thus, the Bulchers actually paid, including shipping, handling, and so on, only about 36% of the retail price. According to Ex. 6, the retail prices for the console cabinet and wall plate rack are $1,296, and $997, respectively. By applying 36% to these prices, the Bulchers appear to have paid approximately $825 for the improper cabinets.
For some reason, the magistrate used the retail price to arrive at $2,293 in damages. Unfortunately, there was no testimony indicating that this represented the cost of putting the Bulchers in the position they would have occupied if the contract had been properly performed. In fact, the testimony indicated only that this amount was the retail value of the wrong cabinets.
In view of the breach, the Bulchers were entitled to recover the cost of the proper cabinets, plus any labor costs required to remove the old cabinets and install the correct size. This could exceed the damages that were awarded. However, the amount also might be less, if, for example, the Bulchers could order the correct size cabinets at a savings from UCC. Again, labor charges would be a factor.
The only proof presented in this regard came from UCC. Specifically, Irwin's testimony and the exhibits indicate that the cabinet problem might be remedied by adding apothecary drawers and by ordering a new wall plate rack. The list prices for these items, respectively, are $427 and $1,595, for a total of $2,022. The "cost" or UCC price for these items appears, respectively, to be $136.04 and $508.17, for a total of $644.81. Neither total includes labor.
In view of the magistrate's obviously incorrect conclusion as to damages, we must reverse the damages award and remand for a redetermination of damages. On remand, the trial court should consider the cost of replacing the cabinets, including reasonable labor costs.
Based on the preceding discussion, the single assignment of error is sustained in part, as to the issue of damages only. Accordingly, this case is affirmed in part, is reversed in part, and is remanded to the trial court for further proceedings consistent with this opinion.
FAIN, J., and YOUNG, J., concur.