[Cite as *Phelps v. Community Garden Assn., Inc.*, 2021-Ohio-3675.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

WILLIE PHELPS, ET AL.,     :

  Plaintiffs-Appellants/   :
  Cross-Appellees,

           :    No. 109766

  v.

           :

COMMUNITY GARDEN
ASSOCIATION, INC.,     :

  Defendant-Appellee/   :
  Cross-Appellant.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART
**RELEASED AND JOURNALIZED:** October 14, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-16-864799

---

### *Appearances:*

Lieberman, Dvorin & Dowd, LLC, David M. Dvorin, and
Brad A. Straka, *for appellants/cross-appellees.*

Ott & Associates, Co., LPA, Steven M. Ott, Lindsey A.
Wrubel, and Christina Pochemsaniy, *for appellee/cross-appellant.*

MARY EILEEN KILBANE, J.:

{¶ 1} Plaintiffs-appellants/cross-appellees Willie and Brenda Phelps ("the Phelpses") appeal from the trial court's judgment granting defendant-appellee/cross-appellant Community Garden Association, Inc.'s ("CGA") motion for partial summary judgment in part, denying the Phelpses' motion for summary judgment, and awarding judgment in CGA's favor in the amount of $1,500 for unpaid assessments and $11,401.50 in related attorney fees. For the reasons that follow, we affirm in part, reverse in part, and remand.

**Factual and Procedural History**

{¶ 2} This case is the second appeal arising from a dispute over an alleged debt CGA attempted to collect from the Phelpses. The Phelpses own real property located at 2116 Richmond Road in the Elizabeth B. Blossom Union Subdivision in Beachwood, Ohio. The houses that comprise the subdivision are subject to a Declaration of Restrictions ("Declaration"). There is a private park adjacent to the houses that was established for the subdivision's benefit. CGA is a nonprofit corporation that administers the park and is funded by the property owners in the subdivision through assessments. The Phelpses have never paid annual assessments to CGA.

{¶ 3} The following facts were set forth in *Phelps v. Community Garden Assn.*, 8th Dist. Cuyahoga No. 107127, 2019-Ohio-1364, ("*Phelps* I"), the first appeal in this case:

In August of 2003, the Phelps took title to their property through a deed that provided that the property was "free and clear from all liens and encumbrances, except zoning ordinances, easements, restrictions and conditions of record * * *." There is no dispute that when the Phelps took title to the property, they had notice that it was part of the subdivision and that it was subject to the Declaration as adopted in 1978 and thereby bound to its terms.

It is similarly undisputed that, at that time, the Declaration did not contain a requirement that obligated property owners to pay assessments. The Declaration did however contain an amendment provision in section 16:

"The Covenants and Restrictions may be terminated or amended at any time by affirmative vote of Owners representing seventy percent or more of the voting power of all Owners."

In May 2007, the Declaration was amended to create an obligation for property owners to pay assessments to CGA. There is not dispute that "seventy percent or more" of the owners voted for the amendment and that it otherwise complied with the procedure required by section 16.[1]

The Declaration as amended contains section 18, which defines the types of assessments that the association may impose, the terms of payment and the consequences of nonpayment. It also outlines the association's obligation to provide owners specific notice in writing about assessments.

In relevant part, section 18(A) makes clear that each owner is required to pay assessments:

---

[1] The parties do not dispute that the amendment followed the procedure required by the Declaration. The Phelpses' argument goes to the substance of the amendment and not the amendment process itself. Nevertheless, for completeness we note that section 16 further provides:

In the event of the amendment or termination of this Declaration, the members of the Architectural Committee shall execute and file a certificate with the office of the County Recorder of Cuyahoga County, Ohio, (a) reciting the effective date of such amendment or termination and that the requisite approval of the Owners was obtained in accordance with the provisions of this Declaration, and, in the event of amendment, (b) containing the complete text of the Declaration, as amended.

"Each Owner of any Sublot, either by present ownership or by acceptance of the deed therefor, whether or not it shall be so expressed in the deed, hereby covenants and agrees to pay the Association regular assessments and special assessments as provided for in this Declaration, and covenants to the enforcement of payment of the assessments and the lien of the Association as hereinafter provided. Such assessment shall be fixed, established, and collected from time to time as provided by the Association. The regular and special assessments, together with any interest thereon and costs of collection thereof, including reasonable attorney's fees, shall be a charge upon each Sublot and a continuing lien upon each Sublot against which each such assessment is made."

In relevant part, section 18(E) obligates the association to provide written notice as to any assessment:

"Written notice of the assessment for each assessment year shall be sent to every Owner subject thereto at least thirty (30) days prior to the commencement of the Assessment Year. The Association shall have the obligation to provide the Owner of each and every Sublot with written notice as to the amount of the Assessment in effect with respect to said Sublot at the time the Owner notifies the Association that such Owner has acquired an ownership interest in said Sublot. Said written notice shall set forth the amount of the periodic installment of Assessments and the dates on which the same are due and payable. Thereafter, the Association shall be obligated to provide written notice of the periodic installment of Assessments only when the amount or payment date thereof changes. All such notices shall be effective as of the date set forth therein and may be delivered to the Owner personally, sent to the address of the Sublot via ordinary U.S. Mail, or conspicuously posted at the Sublot."

{¶ 4} The parties do not dispute that from August 2003 to March 2015, the Phelpses did not receive any notice of assessments in accordance with section 18(E) of the Declaration.

{¶ 5} According to the Phelpses, CGA first attempted to collect assessments from them after the Phelpses' 2014 display of "Black Lives Matter" signs on their property. On March 6, 2015, CGA's counsel sent the Phelpses a letter "regarding

[their] past due maintenance fees and assessment fees" and attempting to collect a debt of $3,215. The March 2015 letter stated that the amount owed was comprised of $3,150 in past due maintenance fees and assessments and a $65 legal fee. On March 17, 2015, CGA's counsel sent a nearly identical letter. On April 27, 2015, CGA sent the Phelpses a letter requesting payment of $3,625 for unpaid annual dues from 2004 through 2014, 2015 annual dues, and legal fees. On March 23, 2016, CGA sent the Phelpses a similar letter requesting payment, incorporating $300 for 2016 annual dues, $200 for late fees (described as $25 per month from July 2015 to present), and $1,035 for legal fees, for a total of $4,985.

{¶ 6} On June 16, 2016, following CGA's attempt to collect assessments from them, the Phelpses filed a declaratory judgment action seeking a declaration that they are not members of CGA and, therefore, they are not obligated to pay CGA any dues or assessments. On August 15, 2016, CGA filed an answer and counterclaim, seeking a declaration that the Phelpses were bound by the Declaration and were required to pay assessments to CGA.

{¶ 7} On March 20, 2017, the Phelpses filed a motion for leave to file an amended complaint. The court granted this motion on April 11, 2017. In their amended complaint, in addition to the declaratory judgment action, the Phelpses asserted claims of retaliation and discrimination in violation of state and federal statutes. On April 19, 2017, CGA filed an answer and counterclaim.

{¶ 8} On August 3, 2017, the Phelpses filed a motion for leave to file a second amended complaint, seeking to add a claim for slander of title based on

CGA's allegedly wrongful filing of a lien on the Phelpses' property. On August 16, 2017, the court denied the Phelpses' motion for leave as untimely.

{¶ 9} On October 16, 2017, CGA filed two motions for summary judgment. The first motion sought summary judgment on CGA's counterclaim seeking declaratory judgment that Phelpses are members of CGA, bound by its Declaration, and obligated to pay CGA assessments. The second motion sought summary judgment on the Phelpses' claims against CGA. On November 15, 2017, the Phelpses filed a brief in opposition to CGA's motions for summary judgment.

{¶ 10} On January 12, 2018, the trial court granted CGA's motion for summary judgment with respect to the Phelpses' claims and granted in part and denied in part CGA's motion for summary judgment as to its counterclaim. The court's journal entry stated, in relevant part:

> This court finds and declares that [the Phelpses'] property is subject to the covenants and restrictions set forth in the 1978 Declaration of Restrictions ("1978 Declaration") on record at the time of their purchase in 2003. This court further finds and declares that by operation of the 1978 Declaration, [the Phelpses] have been members since 2003. However, this court further finds and declares that the 1978 Declaration did not specifically require the members to pay annual assessments as part of their membership. Instead, Amendment 1 to the Declaration of Restrictions ("2007 Amendment") unambiguously mandated the payment of assessments and other dues by all members. Thus, as to count 1 of [the Phelpses'] complaint and count 1 of [CGA's] counterclaim, judgment is granted in favor of CGA and against [the Phelpses] for the payment of annual assessments, special assessments, fees, dues, and other expenses mandated by the 2007 Amendment, with the exception of the period of August 10, 2007 through February 24, 2010, when [CGA] was not in legal existence, in an amount to be determined.

The parties then filed competing briefs as to damages, and on April 3, 2018, the court awarded judgment in favor of CGA in the amount of $17,253.84.

{¶ 11} On April 26, 2018, the Phelpses appealed this judgment, arguing that the trial court erred by finding that they were members of CGA and that they are not obligated to pay CGA assessments, disputing the court's calculation of damages, and complaining that the court improperly subjected their discrimination and retaliation claims to a heightened pleading standard. This court affirmed in part, reversed in part, and remanded the case to the trial court. *Phelps* I at ¶ 3. This court agreed with the Phelpses and found that the trial court erred by determining that the Phelpses were members of CGA. *Id.* at ¶ 19. This court went on to find that while the Declaration imposed a general obligation on the Phelpses to pay assessments, it also imposed a reciprocal burden on CGA to provide the owners specified notice about assessments. *Id.* at ¶ 27-28. This court found that because CGA "failed to identify any evidence that established it provided the Phelps notice" in accordance with the Declaration, CGA failed to establish that it was entitled to summary judgment. *Id.* at ¶ 31. Therefore, this court found that the trial court erred in granting CGA summary judgment and ordering the Phelpses to pay damages based on that judgment. *Id.* Accordingly, this court reversed and remanded the case "for the trial court to determine the date that the Phelpses received notice of assessments as required by the Declaration as well as the correct amount that they owed on that date." *Id.*

{¶ 12} On December 19, 2019, CGA filed a motion for partial summary judgment on all of the Phelpses' claims. On December 20, 2019, CGA filed a motion for partial summary judgment on its counterclaim. Also on December 20, 2019, the Phelpses filed a motion for summary judgment on their claim for slander of title.

{¶ 13} On January 16, 2020, the Phelpses filed a brief in opposition to CGA's motions for summary judgment. On January 17, 2020, CGA filed a brief in opposition to the Phelpses' motion for summary judgment. On January 23, 2020, CGA filed a reply brief in support of its motions for summary judgment. On January 24, 2020, the Phelpses filed a reply brief in support of their motion for summary judgment.

{¶ 14} On February 26, 2020, the court granted CGA's motion for partial summary judgment on its counterclaim, in part. In its journal entry, the court stated, in relevant part:

> This court finds that [the Phelpses] received notice of assessments as required by the Declaration on March 6, 2015. Based upon that date, [the Phelpses] owe [CGA] for unpaid assessments for the years 2015 and forward. Based upon the evidence before it, the court calculates that amount as $300 each for the years 2015, 2016 and 2017; and $600 for the year 2018. There is no evidence to determine the specific amount owed for the year of 2019 or the current year. The court declines to award late fees at this time. The court will address the requested attorney fees for unpaid annual assessments by separate order.

The court further found that CGA placed its lien on the Phelpses' property more than two years after providing the Phelpses notice of assessments, and therefore, the court denied the Phelpses' motion for partial summary judgment on their slander of

title claim. Finally, the court granted CGA's motion for partial summary judgment on the Phelpses' claims.

{¶ 15} The court ordered the parties to submit briefing as to attorney fees. On April 9, 2020, CGA filed a brief in support of attorney fees, asking the court to grant a personal monetary judgment against the Phelpses in the amount of $43,832.26, which CGA asserted was the total amount of assessments and costs of collecting, including late fees and attorney fees. On May 8, 2020, the Phelpses filed a brief in opposition to CGA's brief in support of attorney fees. The Phelpses argued that CGA's request was grossly disproportionate to a disputed debt that the trial court determined to be $1,500. On May 15, 2020, the court awarded CGA $11,401.50 in attorney fees.

{¶ 16} On June 5, 2020, the Phelpses filed a notice of appeal. On June 15, 2020, CGA filed a notice of cross-appeal.

**Assignments and Cross-Assignment of Error**

{¶ 17} The Phelpses raise the following four assignments of error:

**I.** The trial court erred in concluding that the Phelps received a notice of assessment in accordance with the Declaration.

**II.** The trial court erred in concluding that the Phelps owed assessments to the association.

**III.** The trial court erred in awarding attorney fees to the association.

**IV.** The trial court erred in concluding that the association did not slander the Phelps's title when it encumbered the property with an unfounded lien.

{¶ 18} CGA asserts one cross-assignment of error in its cross-appeal:

**I.** The trial court erred in declining to award attorney fees and disbursements related to the "litigation/collection matter," "litigation matter" and Appeal as well as for the [estimated] time to prepare a reply.

**Legal Analysis**

**I. Standard of Review**

{¶ 19} The Phelpses' first and second assignments of error both challenge the trial court's summary judgment decision regarding the CGA assessments. We review a trial court's summary judgment decision de novo, applying the same standard that the trial court applies under Civ.R. 56(C). *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56(C), summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) after construing the evidence most favorably for the party against whom the motion is made, reasonable minds can reach only a conclusion that is adverse to the nonmoving party. Civ.R. 56(C).

{¶ 20} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate the absence of a genuine issue of material fact and entitlement to summary judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party must then point to evidence of specific facts in the record demonstrating the existence of a genuine issue of

material fact for trial. *Id.* at 293. If the nonmoving party fails to meet this burden, summary judgment is appropriate. *Id.*

## II. Assessments

{¶ 21} In the Phelpses' first assignment of error, the Phelpses' assert that the trial court erred in determining that they had received notice of annual assessments in accordance with the Declaration. We agree.

{¶ 22} The central issue in the Phelpses' first assignment of error is whether CGA met its burden to notify the Phelpses of their assessment obligation. This was also the central issue for the trial court to address upon remand from this court following *Phelps* I. In *Phelps* I, CGA asserted that the Phelpses owed it $13,238 for unpaid assessments, late fees, and costs of collection in addition to an unspecified amount for attorney fees, but it made no claim that it gave the Phelpses the requisite notice. *Phelps* I at ¶ 31. In its initial motion for summary judgment, CGA "failed to address the issue of notice" in its supporting brief, and "failed to identify any evidence that established it provided the Phelps notice." *Id.* In its appellate brief in *Phelps* I, CGA stated that it "has been imposing annual assessments to the Phelps since 2004" and cited an affidavit verifying the Phelpses' account balance, but there was no additional discussion of whether or how CGA complied with the Declaration's notice requirement. This court characterized CGA's position as seeking "to hold the Phelps to burdens imposed by the Declaration as amended, while at the same time denying them any of the protections afforded by it." *Id.*

{¶ 23} The Phelpses argued that if they were responsible for any assessments, they could only be responsible for the period for which CGA provided them notice. Thus, according to the Phelpses, they could not be obligated to pay assessments for 2007 through 2014 because the first time they received any communication relating to the alleged debt was the March 2015 letter from CGA's counsel. Our opinion in *Phelps* I acknowledged this, stating that "while the Phelps concede they began receiving notice of assessments starting in 2015, CGA has provided no basis for us to conclude it provided them notice before this point." *Id.* Therefore, this court instructed the trial court "to determine the date that the Phelps received notice of assessments as required by the Declaration as well as the correct amount that they owe based on that date." *Id.* at ¶ 32. *Phelps* I did not make a determination as to whether or not the March 2015 letter complied with the Declaration, whether it constituted adequate notice for assessments for any year after 2015, or whether it reflected the correct amount the Phelpses owed.

{¶ 24} On remand, the parties' competing summary judgment motions reflect different understandings of the scope of this court's remand. CGA argued its motion for summary judgment that it was undisputed that the Phelpses had notice of the assessments from March 2015 onward, citing *Phelps* I at ¶ 31. CGA asserted that this court "found that Community Garden has been properly imposing annual assessments to the Phelps since 2015, and that the issue of notice of the Assessments from 2010 to 2014" was the only issue to be addressed on remand.

{¶ 25} In support of this argument on summary judgment, CGA pointed to various excerpts from deposition testimony. Specifically, CGA cited testimony where Willie Phelps remembered receiving a welcome letter from CGA and subsequent information communications referring to an annual fee paid by CGA members.

{¶ 26} The Phelpses argued that the remand was intended to determine whether CGA met its reciprocal burden of providing them notice of assessments in accordance with the Declaration, as amended, citing *Phelps* I at ¶ 32. The Phelpses asserted that CGA has never complied with the Declaration's notice requirement, pointing to deposition testimony from CGA's treasurer that CGA had no evidence that any assessment invoice had been sent to the Phelpses from 2003 to the present and that the Association had not complied with section 18(E) of the Declaration with respect to the Phelpses. The Phelpses also argue that the only admission they made over the course of this case — the language in ¶ 31 of *Phelps* I relied on by CGA — is that they received communications from CGA beginning in 2015 that attempted to collect the disputed debt. The Phelpses did not, however, concede that the 2015 letters, or any other communications, constituted sufficient notice pursuant to the terms of the Declaration.

{¶ 27} In ruling on the competing motions for summary judgment, the trial court found that the Phelpses "received notice of assessments as required by the Declaration on March 6, 2015." Based on this notice, the court determined that the Phelpses owed CGA for assessments "for the years 2015 and forward." The record

does not reflect any additional analysis by the trial court as to how the March 2015 letter complied with section 18(E) of the Declaration.

{¶ 28} As an initial matter, we must address the scope of our remand in *Phelps* I. The court in *Phelps* I ordered the trial court "to determine the date that the Phelps received notice of assessments as required by the Declaration as well as the correct amount that they owe based on that date." *Phelps* I at ¶ 32. In asserting that the question of whether CGA provided the Phelpses notice between 2010 and 2014 was the only issue to be determined on remand, CGA ignores two important components of the remand. First, the notice issue to be determined on remand was not limited to the period between 2010 and 2014, and it was qualified by whether or not it complied with the Declaration. Thus, the question of whether CGA provided the Phelpses notice in accordance with the Declaration encompasses two issues: whether CGA provided notice, and whether that notice complied with the Declaration. Second, the remand also ordered the trial court to determine the correct amount the Phelpses owed *based on* the date that they received notice in accordance with the Declaration.

{¶ 29} Thus, our analysis of whether CGA was entitled to summary judgment requires an examination of both the notice requirement found in section 18(E) of the Declaration and whether the communications that CGA alleges constituted notice in accordance with section 18(E) such that there were no genuine issues of material fact related to that notice.

{¶ 30} The notice requirement of the Declaration is found in Section 18(E) and requires CGA to provide owners with "[w]ritten notice of the assessment for each assessment year" "at least thirty (30) days prior to the commencement of the Assessment Year." It further requires that the notice "shall set forth the amount of the periodic installment of Assessments and the dates on which the same are due and payable." Therefore, to satisfy the requirements of written notice envisioned by the Declaration, as amended, a written communication must be sent at least 30 days prior to the commencement of the assessment year, and must set forth the date on which the assessment would be due. Conversely, a communication that retrospectively alerts a homeowner to an alleged debt from prior years does not satisfy the notice requirement.

{¶ 31} Turning to the communications that CGA argues constituted notice in accordance with section 18(E) of the Declaration, we will first address the March 2015 letter that CGA relies on and that the trial court found to constitute notice. The letter informed the Phelpses that it was "an attempt to collect a debt on behalf of [CGA]." The letter specified that the amount due included past due maintenance and assessments from CGA in the amount of $3,150 and a $65 legal charge that had been incurred "for the receipt and review of the records, establishing a file, and writing of this letter." The letter did not specify the amount of any of the past due assessments, nor did it provide a list of the assessments' earlier due dates, both of which are required components of proper notice under the Declaration. Further, the letter did not inform the Phelpses of an upcoming assessment. Finally, our

review of the record shows that the "assessment year" for purposes of the Declaration is the calendar year. Therefore, pursuant to section 18(E), proper notice of the 2015 assessment must have been sent at least 30 days prior to January 1, 2015. For these reasons, the March 2015 letter was not a prospectively written notice as required by section 18(E) of the Declaration. On the contrary, it was an attempt by CGA to collect an alleged debt.

{¶ 32} Likewise, the April 2015 and March 2016 letters were also attempts by CGA to collect an alleged debt and did not provide the Phelpses notice of an upcoming annual assessment as required by the Declaration. These communications provided an accounting of allegedly past due assessments and legal fees. Indeed, the letters sent from CGA's counsel to the Phelpses are self-described as attempts to collect a debt, rather than a notice of an upcoming amount owed.

{¶ 33} Therefore, we find that the trial court erred in concluding that the Phelpses received a notice of the assessments in accordance with the Declaration. The Phelpses' first assignment of error is sustained.

{¶ 34} Because we have concluded that CGA failed to provide the Phelpses notice of assessments in accordance with the Declaration, we are compelled to hold that the trial court erred in concluding that the Phelpses owed assessments to CGA. The court in *Phelps* I was clear that "[a]lthough the Phelps are bound to the Declaration as amended, which imposes the general obligation that they pay the association assessments, it also imposes a reciprocal burden on CGA to provide owners specified notice about assessments." *Phelps* I at ¶ 29. The Phelpses'

obligation to pay assessments is directly dependent on CGA satisfying its obligation under the Declaration. As explained in *Phelps* I:

> Section 18(A) provides that assessments become a "personal obligation" of an owner at the time the assessment becomes due. However, the amendment does not indicate any specific amount or due date for assessments. Instead it provides the association flexibility in making these determinations. Nevertheless, as previously discussed, section 18(E) requires CGA initially provide owners written notice of the specific amount and due date. It requires CGA give written notice to owners at least 30 days before commencement of the assessment year. It also requires the association to provide written notice any time the amount of the assessment or the due date is changed. It explains that notice is effective as of the date contained in the notice.

*Id.* at ¶ 30. Our review of the record has not revealed any evidence that CGA satisfied its reciprocal obligation under the Declaration to trigger the Phelpses' personal obligation under section 18(A). We maintain our conclusion from *Phelps* I that the Phelpses have a general obligation to pay assessments. In the absence of any evidence that CGA satisfied their obligations under the Declaration, thus triggering the Phelpses' specific personal obligation, we cannot conclude that the Phelpses owe CGA for assessments for 2015 through 2018. Because CGA failed to establish that it complied with the Declaration, it did not meet its burden of establishing its entitlement to summary judgment as a matter of law. Therefore, the Phelpses' second assignment of error is sustained.

**III. Attorney Fees**

{¶ 35} In the Phelpses' third assignment of error, they argue that the trial court erred in awarding attorney fees to the association. Specifically, the Phelpses argue that CGA is not entitled to an award of attorney fees because they successfully

disputed the validity of the underlying debt. In the alternative, the Phelpses argue that the trial court's award of $11,401.50 in attorney fees was unreasonable and inequitable, especially in proportion to the trial court's award of $1,500 in compensatory damages.

{¶ 36} In CGA's sole cross-assignment of error, it argues that the trial court erred in declining to award attorney fees and disbursements related to the "litigation/collection matter," "litigation matter," and appeal in this case, as well as for the estimated time to prepare a reply.

{¶ 37} Because the third assignment of error and sole cross-assignment of error both challenge the trial court's award of $11,401.50 in attorney fees, we will address them together.

{¶ 38} "'We review a trial court's award of attorney fees for abuse of discretion.'" *Christen v. Continental Ents.*, 2020-Ohio-3665, 154 N.E.3d 1192, ¶ 34 (8th Dist.), quoting *Davis v. Wesolowski*, 8th Dist. Cuyahoga No. 108606, 2020-Ohio-677, ¶ 27. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 39} R.C. 5312.11(A) governs the assessments and fees that an owners association such as CGA may assess and clearly provides that "costs associated with the enforcement of the declaration or the rules and regulations of the owners association, including, but not limited to, attorney's fees, court costs, and other

expenses" may be assessed. Similarly, R.C. 5312.12 provides that after an assessment levied in accordance with R.C. 5312.12 has gone unpaid for ten days after becoming due and payable has a lien upon the lot for the assessment "as well as any related interest, administrative late fees, enforcement assessments, collection costs, attorney's fees, and paralegal fees." Further, the Declaration in this case provides that CGA may recover costs and reasonable attorney fees from a delinquent owner as follows:

> The Board may cause a suit at law to be commenced and maintained in the name of the Association against an Owner to enforce each such assessment obligation. Any judgment rendered in any such action shall include the amount of the delinquency, together with interest thereon at the highest legal rate of delinquency, plus court costs, and reasonable attorney's fees.

{¶ 40} The Phelpses do not dispute that statute and contract provide for recovery of attorney fees. Instead, they assert that CGA is not entitled to an award of attorney fees in this case because they successfully disputed the validity of the underlying debt. CGA's collection efforts in the underlying case sought the collection of allegedly unpaid assessments from 2004 through 2018, and the trial court's February 26, 2020 judgment awarded CGA for assessments from 2015 through 2018. According to the Phelpses, this shows that they were justified in challenging CGA's collection efforts, and therefore, affirming the award of attorney fees would foreclose debtors from disputing alleged debts out of fear that they would be responsible for exorbitant attorney fees if any portion of the disputed debt was deemed valid.

**{¶ 41}** Here, in sustaining the Phelpses' first and second assignments of error, we are reversing the trial court's summary judgment in favor of CGA on its counterclaim and on the Phelpses' declaratory judgment action. Because we have reversed the underlying judgment upon which the award of attorney fees was based, we need not address the reasonableness or amount of the award. In light of our disposition of the first and second assignments of error, we find that the trial court should not have awarded attorney fees to CGA. *United States Fid. & Guar. Co. v. Lightning Rod Mut. Ins. Co.*, 4th Dist. Washington Nos. 95 CA 27 and 95 CA 29, 1996 Ohio App. LEXIS 3497, 13 (Aug. 8, 1996), *rev'd on other grounds*. The Phelpses' third assignment of error is sustained, and CGA's sole cross-assignment of error is overruled.

## IV. Slander of Title

**{¶ 42}** In the Phelpses' fourth assignment of error, they argue that the trial court erred in concluding that CGA did not slander their title when it encumbered the property with an unfounded lien. We disagree.

**{¶ 43}** A slander of title claim may be "brought against anyone who falsely and maliciously defames the property, either real or personal, of another, and thereby causes him some special pecuniary damage or loss." *Green v. Lemarr*, 139 Ohio App.3d 414, 430, 744 N.E.2d 212 (2d Dist.2000), citing *Buehrer v. Provident Mut. Life Ins. Co.*, 37 Ohio App. 250, 257, 174 N.E. 597 (6th Dist.1930). To prevail on a slander of title claim, a plaintiff must prove: (1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3)

the statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages. *Id.*

{¶ 44} Here, the Phelpses are unable to satisfy the third element of their slander of title claim. In the context of a slander of title claim, "malice exists if a party acts in reckless or wanton disregard of the rights of others, even if there is no evidence of personal hatred or ill will." *Weiner v. Kopp*, 1st Dist. Hamilton Nos. C-960611 and C-960631, 1997 Ohio App. LEXIS 2717, 15 (June 25, 1997), citing *Childers v. Commerce Mtge. Invest.*, 63 Ohio App.3d 389, 392, 579 N.E.2d 219 (9th Dist.1989).

{¶ 45} CGA began collection efforts on the disputed debt in this case in March 2015. On March 21, 2017, when those efforts proved unsuccessful, a certificate of lien was recorded against the Phelpses' property in accordance with R.C. 5312.12. The Phelpses' attempt to characterize the lien as an attempt to "strong-arm" them into compliance and a "willful refusal to follow" the mandate in *Phelps I*. Our review of the record reveals no evidence to support this characterization. Although the lien was recorded prior to the ultimate disposition of the validity of the underlying debt, this fact is insufficient to establish that CGA acted in a reckless and wanton disregard of the Phelpses' rights.

{¶ 46} Because the Phelpses cannot satisfy the third element of their slander of title claim, the trial court properly denied the Phelpses' motion for partial summary judgment on their slander of title claim. Therefore, the Phelpses' fourth assignment of error is overruled.

{¶ 47} Judgment affirmed in part, reversed in part, and remanded.

It is ordered that appellants/cross-appellees recover from appellee/cross-appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

EILEEN A. GALLAGHER, P.J., CONCURS;
EILEEN T. GALLAGHER, J., DISSENTS WITH SEPARATE OPINION

EILEEN T. GALLAGHER, J., DISSENTING:

{¶ 48} I respectfully dissent from the majority's conclusion the Phelpses did not receive notice of the annual assessments outlined in the Declaration. The Phelpses conceded that "they began receiving notice of assessments in 2015 * * * ." *Phelps* I, 8th Dist. Cuyahoga No. 107127, 2019-Ohio-1364, ¶ 31. Indeed, the undisputed evidence shows the Phelpses received a letter from CGA notifying them that they owed assessments on March 6, 2015. The majority nevertheless concludes that notice was not sufficient because it failed to strictly comply with the notice provisions in the Declaration. However, this court has held that failure to comply with notice provisions in a written document such as the Declaration can be

construed as harmless if there is evidence of actual or constructive notice. *MRI Software, L.L.C. v. West Oaks Mall FL, L.L.C.*, 8th Dist. Cuyahoga No. 105846, 2018-Ohio-2190, ¶ 22 ("Even if written notice is required, where there is evidence of actual notice, a technical deviation from a contractual notice requirement will not bar the action for breach of contract brought against a party that had actual notice."). *See also Gollihue v. Natl. City Bank*, 2011-Ohio-5405, 969 N.E.2d 1233, ¶ 22 (10th Dist.2011) (failure to comply with written notice provisions in a construction contract may be construed as harmless if there is evidence of actual or constructive notice); *Daniel E. Terreri & Sons v. Bd. of Mahoning Cty. Commrs.*, 152 Ohio App.3d 95, 2003-Ohio-1227, 786 N.E.2d 921 (7th Dist.) (same).

{¶ 49} "'The purpose of requiring written notice is not to be hypertechnical but, instead, to create certainty.'" *Marion Forum, L.L.C v. Lynick Ents.*, 3d Dist. Marion No. 9-12-13, 2012-Ohio-5947, ¶ 22, quoting *McGowan v. DM Group IX*, 7 Ohio App.3d 349, 352, 455 N.E.2d 1052 (10th Dist.1982).

{¶ 50} The Phelpses admit they had notice of the assessment as of March 6, 2015. Therefore, the trial court reasonably determined that the Phelpses became liable for the assessments as of that date going forward. To conclude otherwise elevates form over substance and fairness. I would, therefore, affirm the trial court's judgment awarding CGA damages in the amount of $300 each of the years 2015, 2016, and 2017, and $600 for the year of 2018. As noted by the trial court, there is no evidence in the record to determine the amount of damages owed for 2019 and 2020.

{¶ 51} Having concluded that the trial court properly found the Phelpses had notice of the assessments, I would affirm the trial court's finding that CGA did not slander the Phelpses' title when it encumbered their property with a lien. To succeed on a claim for slander of title, the claimant must prove the following "'(1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages.'" *Silberhorn v. Flemco, L.L.C.*, 8th Dist. Cuyahoga No. 108346, 2020-Ohio-913, ¶ 16, quoting *Green v. Lemarr*, 139 Ohio App.3d 414, 430-431, 744 N.E.2d 212 (2d Dist.2000).

{¶ 52} The lien was published when it was filed in the Cuyahoga County Recorder's Office. The Phelpses' claim the lien caused damage because it prevented them from refinancing their home and from obtaining financing for a new car. Therefore, the issue here is whether the lien was invalid and, therefore, false and whether the CGA acted with malice or with a reckless disregard for its falsity.

{¶ 53} As previously stated, the Phelpses had notice that their property was subject to assessments, and they refused to pay them. Courts have held that when a property owner in an association fails to comply with the covenants and bylaws of the association, including the payment of association fees, the association may validly place a lien on the owner's property. *Waterford Pointe Condominium Assn. v. Res. Domicles, Ltd.*, 9th Dist. Summit No. 28766, 2019-Ohio-691. There is no evidence that the CGA acted maliciously or with reckless disregard for the validity

of the lien; it was merely trying to collect overdue assessments. Therefore, the lien was valid and appropriate.

{¶ 54} Finally, I would affirm the trial court's judgment awarding attorney fees. The trial court was authorized to award attorney fees pursuant to R.C. 5312.13, which imposes liability for attorney fees incurred by an owners' association for a violation of "any covenant, condition, and restriction set forth in any recorded documents to which they are subject." Section 18(A) of the 2007 Amendment to the Declaration authorizes the collection of attorney fees in conjunction with the collection of assessments.

{¶ 55} CGA argues the trial court should have awarded a total of $43,832.26 in attorney fees instead of the $11,401.50 it actually awarded. CGA asserts in its cross-appeal that the attorney fee award "is so low as to shock the conscience." However, "it is well settled that where a court is empowered to award attorney fees by statute, the amount of such fees is within the sound discretion of the trial court. Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere.'" *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146, 569 N.E.2d 464 (1991), quoting *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.*, 23 Ohio App.3d 85, 91, 491 N.E.2d 345 (12th Dist.1985).

{¶ 56} The trial court's award of $11,401.50, is reasonable based on the time and labor involved in maintaining the litigation, the complexity of the questions involved, the professional skill required to perform the necessary legal services, the

experience of the attorney, and the expenses of associated with the litigation.  I, therefore, would affirm the trial court's attorney fee award.