[Cite as *Speedy Maintenance Serv., L.L.C. v. Windsor Tower, L.L.C.*, 2024-Ohio-5841.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

SPEEDY MAINTENANCE SERVICE
LLC

    Appellant

v.

WINDSOR TOWER LLC et al.

    Appellee

:
:
:
:
:
:
:
:
:
:
:
:

C.A. No. 29996

Trial Court Case No. 2021 CV 01747

(Civil Appeal from Common Pleas
Court)

. . . . . . . . . . .

O P I N I O N

Rendered on December 13, 2024

. . . . . . . . . .

BRADLEY R. HOYT, Attorney for Appellant

ALEX J. CASTLE, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Appellant Speedy Maintenance Service LLC ("Speedy") appeals from a judgment of the Montgomery County Common Pleas Court awarding $48,260 to Appellees Windsor Tower LLC ("Windsor Tower") and Windsor Construction Services

LLC ("Windsor Construction") (collectively "Windsor") on their counterclaims for breach of contract and slander of title.   For the following reasons, the judgment of the trial court will be affirmed.

### I.    Procedural History and Facts

{¶ 2} On April 29, 2021, Speedy filed a complaint in the Montgomery County Common Pleas Court against Windsor Tower, Windsor Construction, and the Montgomery County Treasurer ("Treasurer"), asserting claims for: 1) breach of contract, 2) unjust enrichment, 3) foreclosure of mechanics lien, and 4) violation of R.C. 4113.61. The fourth claim was withdrawn by Speedy during trial.

{¶ 3} The Treasurer filed an answer asserting its interest in real estate taxes and assessments if the property were sold.   Windsor filed a Civ.R. 12(B)(6) motion to dismiss, which the trial court overruled.

{¶ 4} On January 26, 2022, the parties filed an agreed application to approve a bond to discharge the mechanics lien filed by Speedy related to the third claim for relief, which the trial court approved.   On February 15, 2022, Windsor Tower and Windsor Construction filed their answer and counterclaim, asserting counterclaims for breach of contract and slander of title.

{¶ 5} The matter proceeded to a bench trial on June 15, 2023, and November 9, 2023.   The following testimony was presented at trial.

{¶ 6} Otis Stevens, the managing member of Speedy, testified that Speedy was a restoration contractor that dealt with masonry and concrete restoration and had been in business for about 30 years.   Stevens became acquainted with Windsor Construction

through Alexius Dorsey, the owner, whom Stevens knew as "Alex." Dorsey thought Stevens might be interested in a renovation project, which later turned out to be a parking structure at 40 West 4th Street in Dayton, Ohio. The building project was a large commercial building, about 14 stories tall, that had a parking garage at the rear with 6 parking levels. The building was a concrete structure with a rain sweep veneer on the exterior. When Stevens and Dorsey walked through the garage, Stevens said he was interested in doing the project and agreed to do it.

{¶ 7} Speedy was commissioned to restore the surface parking portion of the garage structure. The surface was made of concrete and rebar, and Speedy was charged with removing the rusted steel and the spalling concrete as laid out by the engineer in a project manual provided by Windsor. Speedy received specification sheets, and its employees took classes on how to install to the manufacturer's specifications. Speedy and Windsor talked comprehensively about how to proceed, including meeting with the product manufacturer to learn how to meet the manufacturer's standards. Stevens explained that it was not uncommon to have product manufacturers involved to ensure their products were installed correctly to certify the warranty on the product. Windsor provided several items needed for the construction because they wanted to be involved in controlling multiple aspects of the project.

{¶ 8} No formal bid for the project was submitted by Speedy, although Stevens stated he wrote up an estimate. The purported estimate was never signed and was not introduced at trial. Speedy prepared a notice of furnishing, which identified the project as 40 West 4th Street Garage Improvement and stated that Speedy would furnish or

perform the following: demolition and site protection, shoring and forming, steel repairs, slab and joist repairs, column repairs, overhead repairs, and material removal and disposal. The notice did not give an estimate for the cost of the work. Stevens stated that he negotiated the terms of the contract with Dorsey, and they had an oral agreement. According to Stevens, Speedy was expected to do what the engineer had reported and repair all the concrete surfaces on each floor, which included the deck on the sixth floor and repairs on the fifth, fourth, and possibly the third floors. Stevens expected to be paid $85,000 for the fifth floor, and then $75,000 for the other floors. Stevens explained that the extra $10,000 for the fifth floor was because of training and mobilization. It was anticipated the work would take about four to five weeks per floor, and Speedy was expected to work six or seven days per week to meet the scheduling, which it did. On average, Speedy had five to six men on site daily. Joe Circle, from Windsor, was also on site daily.

{¶ 9} Speedy started working on the project on September 10, 2019, and ended all work on November 6, 2019. Speedy was supposed to follow the engineer's layout of specifications for restoring the concrete surfaces of the garage. Speedy was to remove patches of concrete, spall concrete and rebar, and replace the rebar that tied together. The repairs included some of the ceilings, columns, and walls. The engineer marked the concrete surfaces of the areas in which the repairs were to occur, and those were the primary areas in which Speedy worked. However, sometimes there were areas that needed work that had not been marked, and Speedy would check with the superintendent and the engineer before moving forward with those repairs. Both Speedy and Windsor

supplied equipment to perform the repairs.

{¶ 10} Stevens testified about several photographs that depicted some demolition work done by Speedy as well as some of the completed repairs. Speedy made cuts into the old surfaces and removed damaged material that was then replaced. The work Speedy did on the garage was mainly on the fifth floor. Stevens was not aware of why Windsor wanted them to start on the fifth floor.

{¶ 11} On September 16, 2019, Speedy submitted invoice number 1713 to Windsor, identified as services on "1 floor @ $75,000" for work performed on the fifth floor. Stevens testified that Windsor paid $5,000 for that invoice and then an additional $10,000 later.

{¶ 12} In an email on September 20, 2019, Windsor requested that all shoring on the fifth floor be completed that day according to the structural engineer's project requirements. Shoring was the process of holding up the structural underpinning of a surface. Windsor also requested start and end times each day with the number of personnel on site. Stevens testified that Speedy provided daily manpower timesheets to Windsor when requested.

{¶ 13} On September 24, 2019, Windsor advised that their target for completing fifth floor saw cuts, shoring, prepping, and steel installation was September 27, 2019. Windsor also inquired about daily time sheets and a labor proposal from Speedy for the fifth floor, indicating there had been no contract signed. Stevens responded that Speedy was about halfway done with the work on the fifth floor but foresaw issues with Windsor's timeline. Although Stevens provided a list of man hours, he clarified that Speedy was

not charging by man hours but rather "working off an evaluation given by Alex at $75,000 per floor." Pl. Ex. 11.

{¶ 14} By September 30, 2019, Speedy started working on the sixth floor of the garage. According to Stevens, there was no way to do the fifth floor without doing some work on the fourth and sixth floors too. Stevens could not recall if any new concrete had been poured by September 30, 2019. While Speedy was working on the project, a product inspector verified that the products were being installed correctly to the manufacturer's specifications, and employees of Windsor took photos of the progress Speedy completed. Ed Baum, the engineer on the project, also checked on Speedy's work and approved of Speedy pouring concrete.

{¶ 15} On October 11, 2019, Speedy sent Windsor invoice number 1717 for $23,007.60, which included additional services that Speedy had provided. A change order was submitted breaking down the $23,007.60 into labor hours and costs. By that time, there was another subcontractor, later identified as Juan Osario, involved in the project doing masonry work. Osario was working on floors one, two, and three of the garage but was not doing any work on the upper floors. Speedy removed concrete and debris for Osario and also took a load or two to the dumpster, which Speedy billed as time and material on the invoice.

{¶ 16} On October 15, 2019, Circle emailed Stevens stating that, before Windsor would release any money, Speedy needed to complete the full slab and joint repair on the fifth floor. Circle expressed concerns that Speedy had invoiced for 44% of the total agreed price but that only 10% of the work had been completed. Stevens sent an email

response that same day explaining that they had an agreement "between 75 and 80,000 per floor" and Speedy had far exceeded Circle's 10% estimate to be entitled to the money billed. According to Stevens, Speedy was about 80% done with the concrete slab and ceiling deck, including the main vertical columns, which was the majority of the work. Stevens claimed Speedy was eligible for a draw based on work completed, and he demanded payment.

{¶ 17} On October 17, 2019, Circle emailed Stevens stating that Windsor expected the entire fifth floor to be completed by October 31, 2019. Stevens indicated Speedy would aim for that completion date barring anything outside its control. By October 24, 2019, Speedy had poured concrete in several areas of the garage on the fifth floor, but Speedy did not complete the entire fifth floor before October 31, 2019.

{¶ 18} Stevens estimated that Speedy was about 80-90% finished with all the work on the fifth floor as of October 29, 2019. The progress reports indicated that 185 square feet of demo slab joist had been cleaned and 831 square feet of completed slab joist had been repaired. Stevens estimated that the whole fifth floor was around 6,000-8,000 square feet.

{¶ 19} Invoice number 1720 was sent to Windsor on October 29, 2019, requesting the amount of $15,000. According to Stevens, this included additional work done by Speedy, including cleanup and debris removal, that was not part of the agreed flat price per floor. A final invoice was sent to Windsor dated November 4, 2019, invoice number 1722, requesting a balance due of $8,000. Stevens claimed this invoice was for work done off the fifth-floor contract price.

**{¶ 20}** On November 6, 2019, Stevens received a letter stating that Speedy was being terminated for cause. The termination letter ordered Speedy to "cease all work on both the DP&L and 40 West 4th Garage." According to Stevens, Speedy had been working on more than one project for Windsor and there had been an issue with the DP&L location, not the garage. Stevens denied receiving any notification of default or notice to cure default prior to receiving the termination letter. The following day, Stevens responded to the termination letter and indicated that Windsor had only paid $19,000 of the $85,000 contract and demanded payment of $66,000.

**{¶ 21}** Stevens testified that as of November 6, 2019, he estimated Speedy had invoiced Windsor for about $64,000, but Windsor had only paid somewhere between $39,000-42,000. Tr. 95. For the final November 4, 2019 invoice, Windsor changed the $8,000 invoiced amount to reflect approval for $4,444.44 of work completed with a 10% reduction resulting in a payment of $4,000. Speedy filed a mechanics lien on the property for $66,000, which was recorded with the Montgomery County Recorder.

**{¶ 22}** Stevens testified that Speedy submitted an application for payment for the dates of September 27, 2019, through October 11, 2019, indicating that the contract price was $75,000, that $10,000 had previously been paid, and that Windsor owed $7,370. A second application for payment was submitted for the dates October 11, 2019, through October 22, 2019, which indicated the original contract sum was $75,000, a net change was added by a change order for $10,000, and the current amount owed was $17,550. Stevens testified that the change order was not for additional work done but was for "mobilization and training," which was the additional $10,000 that made up the total of

$85,000 for the fifth floor. A third application for payment was submitted for the dates of October 22, 2019, through October 28, 2019, which indicated that no work had been completed during that time frame. Stevens testified he was certain that work was performed during that time frame even though Speedy's submission stated none had occurred. The third application indicated that only 46 percent of the project was completed. Stevens explained that the amounts listed in the applications were requested amounts, but the engineer, architect, or owner would have to sign off on it before it would be paid.

{¶ 23} Stevens testified the initial contract price did not include the change orders when additional work was needed. Stevens would approve a change with the engineer and the owner and have an agreed price for the work. Stevens initially claimed there were discussions in emails with Circle regarding the change orders, but when questioned where in the emails those discussions were, he stated that they had occurred by oral communication. Stevens testified that there had never been an agreement to send invoices for time and materials, it was just the simplest way to keep costs down. In total, there were 674 hours of work for which Stevens submitted invoices that were above and beyond the originally agreed contract price.

{¶ 24} Joseph Circle testified on behalf of Windsor. Circle had a Master of Science degree from Ohio State University and had more than 29 years of experience in construction. Circle was the director of preconstruction and a senior project manager for Windsor. His duties were to prepare a project for construction and support the production process.

{¶ 25} In 2011, the previous owners of 40 West 4th Street created a manual that provided specifications for how to properly perform the repairs for the garage. In July 2019, Windsor, as the current owner of 40 West 4th Street, worked with a structural engineer to create permit plan drawings. The garage was constructed of concrete and steel, and, over time, water had infiltrated the concrete, which ultimately caused the loss of structural integrity. The drawings represented the garage in two dimensions and provided plan notes for how to properly perform repairs.

{¶ 26} Circle was not involved in developing the July 2019 plans. When he was brought onto the project in September 2019, Speedy had already begun work on the project. The first time Circle met Stevens was at the garage while Dorsey introduced Circle to the project and walked him through his responsibilities. According to Circle, Speedy had received a copy of the 2011 manual and the 2019 drawings before it started working on the garage.

{¶ 27} Circle testified that Speedy never submitted a bid for the job. Circle made multiple requests of Speedy for a signed contract in order to continue working on the project, but Speedy never signed the written contract. Circle testified that Stevens was reluctant to sign it. The budget for the project was $75,000 per floor of the garage, and the parties understood that to mean they were not to exceed $75,000. This would have included both cantilevered levels and the ramps for that floor. They were proceeding with the fifth floor as a trial level because Speedy's personnel were getting trained to do it. The work itself was a bit ambiguous in scope because some defects were identified as the work progressed.

{¶ 28} According to Circle, Speedy's work was not performed in a consistent and timely manner. Attendance was spotty, and Speedy failed to meet a single deadline. Speedy's workers were not consistently present, workers would show up at different times, and they worked on different areas than were requested. Circle repeatedly asked for updates and tried to review the expected timelines with Stevens to no avail. The timeline was based on the need to put forms up, schedule the concrete, and schedule special inspections. There was a timeline of eight weeks per floor in the contract. Speedy initially worked on the first half of the upper fifth floor parking deck surface. By the time Speedy was terminated from the project, more than eight weeks later, it had not even completed the parking deck surface demolition on the upper level of the fifth floor.

{¶ 29} On October 15, 2019, Circle sent an email to Speedy stating that he was "concerned about the rate of production." Circle was distressed that Speedy was both overbilling them and behind schedule. Circle and Dorsey were at the construction site regularly working, training, and assisting Speedy. Circle also had safety concerns for the work performed by Speedy. Due to the condition of the structure, sections of columns, beams, and major sections of flooring had to be cut out to get repaired. Based on the engineered specifications regarding structural integrity, they needed to have support from at least two levels below where they were working. Failing to properly shore up their work would have resulted in the building collapsing and destroying the structure. Speedy did eventually correct the shoring issues.

{¶ 30} On October 29, 2019, Circle sent Stevens another email in which he had measured and calculated the square footage that had been completed. At that time,

Circle measured 1,626 square feet of demoed slab joist that was not clean and 185 square feet of demoed slab joist that was clean. Whether it was clean determined whether it was ready for the bonding agent to be applied, which had to be done prior to pouring the concrete. There was 831 square feet of completed slab joist repaired, meaning that the concrete had been poured back. As of October 29, 2019, Speedy did not pour any additional concrete. The total surface area for the fifth floor was 10,000 square feet. Circle estimated that Speedy completed only about 20% of the fifth floor. However, after Speedy was terminated, Circle had to replace all of Speedy's work.

{¶ 31} Speedy was sent a termination letter that related to multiple projects. Circle testified that Speedy had been terminated for overall lack of performance, inability to bid the work, no signed contract, and some egregious behaviors. By the time it was terminated, Speedy had billed about $38,000. A final invoice dated November 4, 2019, was received requesting an additional $8,000, some of which was paid. The total amount paid to Speedy by Windsor for this project was $44,300.

{¶ 32} After Speedy was terminated, Circle took photographs of the purported repairs that Speedy had made to the garage. Circle testified that the photographs showed failed repairs on the fifth-floor slab and ceiling. This included photographs showing concrete repairs that did not cover the rebar or the slab and joists, areas where rebar was protruding from the concrete, and areas where the concrete had already chipped and failed.

{¶ 33} An independent third-party engineering firm questioned the integrity of all the work Speedy had done on the upper fifth floor. The firm had not been able to

evaluate Speedy's work until after Speedy was terminated because the concrete had not yet cured. Ed Baum, an engineer working on the project, had inspected Speedy's work prior to termination, and he had expressed concern to Circle about Speedy's work.

{¶ 34} Juan Osorio, who had been working on different floors of the garage, redid all the work that Speedy had done. Windsor paid Osorio a total of $65,300 for the work he completed on the fifth floor of the garage.

{¶ 35} Alexius Dorsey testified next as the owner of Windsor Construction Service and Windsor Tower, LLC. Dorsey was a developer and had been involved in the construction industry his whole life. He carried several licenses for the company, including HVAC, electrical, plumbing, and asbestos. Windsor would purchase adaptive reuse buildings and develop them. Windsor did the acquisition, development, construction, and management of all of its own assets.

{¶ 36} Windsor purchased the property at 40 West 4th Street in early 2019. When Dorsey purchased the property, he knew it needed work, and he hired a company to develop plans for redoing the tower.

{¶ 37} Dorsey met Stevens while working on a project at the Fire Blocks, another property in Dayton, Ohio. Stevens introduced himself as a mason and discussed the project at 40 West 4th Street. As Windsor received engineering reports, he kept Stevens updated and they walked through the project together a few times. He and Stevens went over the scope of the work that Windsor had prepared with the engineers. Through their discussions, Dorsey discovered that Stevens was not comfortable giving a number for the project. Therefore, Dorsey offered the number $75,000 for one floor, which was to

include the crash walls, columns, ramps, and both levels of each floor. Stevens agreed to that amount.

{¶ 38} Once Speedy started working on the project, Dorsey was at the job site two or three days a week to help show Speedy's crew how the process should work. Dorsey quickly learned that Speedy did not have the right equipment, so Dorsey purchased it to help Speedy do the work. After three or four weeks of work, Dorsey had safety concerns with Speedy's work, and it was behind schedule. Dorsey had built the forms, the outlines of the areas in which to support concrete, and provided those to Speedy, but they were installed incorrectly and there was insufficient shoring. He let Circle know about the issues and said things needed to be corrected before pouring any concrete.

{¶ 39} Dorsey made the decision to terminate Speedy from the job based on how far behind Speedy was in completing the project and Speedy's inappropriate billing. After Speedy was terminated, Dorsey inspected the work and concluded that nothing was fully completed. There were several things that were in the process of being completed, but nothing was fully finished. When Speedy was terminated, Windsor had paid Speedy around $38,000.

{¶ 40} Dorsey was never served with a mechanics lien. Rather, when Windsor was closing on the loans for its property, a title agency discovered the mechanics lien. The mechanics lien was dated November 6, 2019, and alleged that $66,000 was owed to Speedy. According to Dorsey, $66,000 was never a number that fit the work. When Dorsey learned of the mechanics lien, he contacted Stevens and demanded that the lien be removed, which Stevens refused. As a result of the mechanics lien, the closing did

not go through, and Windsor lost a bridge lender for its loan. Between the time that the loan closing was to originally happen and the time that Windsor obtained a new bridge lender and closed, the interest rate had increased markedly. Based on the increase in interest on the loan, Dorsey had to pay over a million dollars more than he originally anticipated. In order to complete the closing, Dorsey had to bond the lien off because Speedy refused to remove it and the lenders would not close with a lien on the property. Windsor made two payments for a total of $3,960 to pay for the bond.

{¶ 41} Dorsey had worked with Osario on several prior ventures before the 40 West 4th Street project. Once Dorsey determined that Speedy was unable to handle the work on this project, Dorsey hired Osario to start work on the garage's lower levels. Osario started work on the lower floors while Speedy worked on the fifth floor. When inspections were done after Speedy was terminated, it was discovered that Speedy had done the work incorrectly. Baum had indicated it was poor craftsmanship and Speedy's work needed to be repaired and replaced. Dorsey decided to have Osario redo the fifth floor. Because nothing Speedy had worked on was fully completed, it was hard for Dorsey to estimate how much work Speedy had actually completed by the time it were terminated. However, Dorsey estimated it was probably around 20%. Although Windsor paid Speedy $44,300 to restore the fifth floor, it received no benefit from Speedy's work because everything had to be redone.

{¶ 42} Stevens testified on rebuttal that he had originally believed the project was going to be for all six floors. Then the agreement was that Speedy was going to only do floors four, five, and six. Stevens believed that eight weeks per floor was an aggressive

schedule but Speedy tried to meet this deadline.   Stevens stated he brought his dump truck, mixer, and Bobcat to do work on the garage and helped Osario do cleanup on his floor.   Stevens explained that he had a base contract and then billed for additional things a la carte or for time and materials.

{¶ 43} Stevens stated that Speedy worked on the fifth-floor slab, the ramps from the fourth floor to the fifth floor and the fifth floor to the sixth floor, mock-up work on the fifth-floor columns, patched some of the ceiling, and did the crash barriers.   Speedy used man hours to justify the invoicing.   Although it invoiced for more, Speedy only received $19,000 from Windsor.

{¶ 44} On cross-examination, Stevens conceded that it was possible one or two payments from Windsor may not have been included in the $19,000 total.   According to Stevens, the change order was the only documentation that Speedy was billing for time and materials; there was no other agreement.   The $66,000 Speedy claimed Windsor owed was based on the contract price and the time and materials billings.

{¶ 45} The trial court entered a final judgment on November 22, 2023, finding in favor of Windsor.   The trial court awarded Windsor $44,300 plus prejudgment and postjudgment interest on its breach of contract claim, declared the mechanics lien null and void, discharged and released the bond, and awarded Windsor $3,960 on its slander of title claim for insurance premiums paid to bond off the lien, plus postjudgment interest. Finally, the trial court awarded Windsor the costs of the action.   Speedy filed a timely notice of appeal.

{¶ 46} On appeal, Speedy raises a single assignment of error alleging that the trial

court's decision was against the manifest weight of the evidence.   We disagree.

## II.   Manifest Weight of the Evidence

**{¶ 47}** The same manifest weight standard applies in both civil and criminal cases. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 17.   "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)."   *Id.* at ¶ 19.

**{¶ 48}** "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   (Citation omitted.)   *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.).   "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' " (Emphasis in original.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990).   " 'Weight is not a question of mathematics, but depends on its *effect in inducing belief*.' "   (Emphasis in original.)   *Id.*, quoting *Black's Law Dictionary* (6th Ed. 1990).

**{¶ 49}** "This Court, in reviewing a weight of the evidence challenge, must consider the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice."   *Emswiler v. Bodey*, 2012-Ohio-5533, ¶ 43 (2d Dist.), citing *Thompkins* at 387.   The discretionary power of a reviewing court to grant a new trial is to be exercised only in the exceptional

case in which the evidence weighs heavily against the judgment. *State v. Lang*, 2011-Ohio-4215, ¶ 220, citing *Thompkins* at 387. We make every reasonable presumption in favor of the judgment and any finding of fact; if the evidence is susceptible of more than one construction, we are bound to interpret it in favor of the fact-finder's ruling. *Eastley* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984).

### a. Breach of Contract

{¶ 50} In this case, the trial court found that Windsor had proven by a preponderance of the evidence that Speedy had breached the contract. The trial court determined that 1) there was a contract between the parties to renovate the garage for $75,000 for each floor; 2) Speedy breached the contract by failing to perform the work in a workmanlike manner and in a timely fashion; and 3) as a result of the breach, Windsor had to redo all of Speedy's substandard work, which resulted in damages. The record supports the trial court's decision.

{¶ 51} To prove a breach of contract claim, the claimant must establish by a preponderance of the evidence "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Doner v. Snapp*, 98 Ohio App.3d 597, 600 (2d Dist. 1994). A "preponderance of the evidence" is the greater weight of the evidence that is not necessarily beyond all reasonable doubt but is "sufficient to incline a fair and impartial mind to one side of the issue rather than the other." *Black's Law Dictionary* (12th Ed. 2024).

{¶ 52} It is undisputed that there was a contract for Speedy to renovate the fifth floor of the 40 West 4th Street garage. Stevens testified that the base contract was for

$75,000 per floor but claimed the contract amount increased to $85,000 for the fifth floor because of mobilization and training. Both Circle and Dorsey testified that the agreement was for Speedy to complete the renovation of the fifth floor for $75,000. The trial court found that the agreed contract was for Windsor to pay Speedy $75,000 for reconstruction of the fifth floor. In making this determination, the trial court explicitly found the testimony of Circle and Dorsey credible and Stevens's testimony not credible. We defer to the credibility determinations of the trial court because "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co.,* 10 Ohio St.3d at 80.

{¶ 53} Although each party relied on the written contract drafted by Windsor in support of its position, Stevens asserted at trial that the contract was $85,000 for the fifth floor. The contract explicitly stated that "Payment will be $75,000.00 for both upper and lower levels of each floor where work is performed including the underside of the floors and both ramps." Joint Ex. III. Dorsey testified that he and Stevens verbally reached an agreement that Speedy would be paid $75,000 per floor. Tr. 269-270. Speedy's invoice for September 16, 2019, stated "Services 1 floor @ $75,000" and requested payment for work performed on the fifth floor at 40 West 4th Street Garage. Pl. Ex. 2. In an email written by Stevens to Circle on September 24, 2019, Stevens wrote that Speedy was "working off an evaluation given by Alex at $75,000 per floor." Pl. Ex. 11. Speedy's invoice for a payment period of September 27, 2019, through October 11, 2019, again listed the contract sum as $75,000. Joint Ex. VII; Def. Ex. D. There is no

documentation in the record showing that Windsor agreed to pay Speedy an additional $10,000 for mobilization and training. Accordingly, the greater amount of credible evidence supported the trial court's finding that the parties had agreed to a contract for Speedy to complete renovations of the fifth floor at 40 West 4th Street garage in the amount of $75,000.

{¶ 54} On November 6, 2019, Speedy was terminated from the 40 West 4th Street garage project due to Speedy's "lack of performance" and "failure to perform to standard." "Ohio common law imposes upon builders and contractors a duty to perform their services in a workmanlike manner." (Citations omitted.) *Jarupan v. Hanna*, 2007-Ohio-5081, ¶ 19 (10th Dist.). "This implied duty 'requires a construction professional to act reasonably and to exercise that degree of care which a member of the construction trade in good standing in that community would exercise under the same or similar circumstances.' " *Id.*, quoting *Seff v. Davis*, 2003-Ohio-7029, ¶ 19 (10th Dist.).

{¶ 55} Although Speedy argues that it did not receive sufficient notice of any defects prior to Speedy's termination, Circle had had several email correspondences with Stevens in which he identified the fact that Speedy was behind schedule as well as issues with Speedy's work. Circle testified that Speedy had failed to meet a single deadline. Stevens testified that each floor was expected to take only four to five weeks to complete, while Dorsey testified it should not have taken more than four weeks to finish each floor. The written contract indicated that completion of the fifth-floor renovations was expected to take no longer than eight weeks and specifically included that time was of the essence in performance of the contract. Joint Ex. III. Speedy started working on the garage

project by at least September 10, 2019, and ended all work as of November 6, 2019, eight weeks later.   After eight weeks, the fifth floor was not close to being finished.

{¶ 56} On October 15, 2019, Circle sent an email to Stevens stating that he was "concerned about the rate of production."   On October 17, 2019, Stevens was advised that Windsor expected the entire fifth floor to be completed by October 31, 2019.   On October 29, 2019, Circle measured and calculated the square footage that was supposedly completed.   Of the 10,000 total square footage of the fifth floor, 1,626 square feet of demoed slab joist was not clean, 185 square feet of demoed slab joist was clean, and only 831 square feet of completed slab joist had been repaired, meaning that the concrete had been poured back.   Stevens testified that by the end of October, Speedy had completed 80-90% of the fifth floor.   The trial court found Steven's testimony was not credible.   Based on the testimony of Circle and Dorsey, as of November 6, 2019, Speedy had only completed about 20% of the work on the fifth floor.

{¶ 57} There were also concerns about the quality of Speedy's work.   Dorsey testified that he had built the concrete forms himself and provided those to Speedy, but they were installed incorrectly and there was insufficient shoring under them.   On September 30, 2019, Circle advised that there were issues with the forms that had been installed as there were "gaps on the bottom and on the sides."   Pl. Ex. 11.   On October 4, 2019, Circle emailed Speedy that the engineer advised that the scaffold being used as shoring was not sufficient; moreover, Speedy needed to expand the shoring and get some "steel shims installed under the I beam shoring."   *Id.*   Although Stevens claimed the shoring was sufficient, on October 7, 2019, Circle forwarded to Stevens a message from

Baum, an engineer on the project, which stated that the scaffolding was "No Good." *Id.* Based on the engineered specifications to keep the building standing, Speedy needed to have support from at least two levels below where they were working. Failing to properly shore up its work would have resulted in the collapse of the garage. Circle testified that Speedy did eventually correct the shoring issues.

{¶ 58} After the contract was terminated, Circle evaluated the work Speedy had done to the garage, which was determined to be completely useless. Photographs Circle took showed the failed repairs on the fifth-floor slab and ceiling. This included photographs showing concrete repairs that did not cover the rebar or the slab and joists, areas where the rebar was protruding from the concrete, and areas where the concrete had already chipped and failed. In November 2019, an independent third-party engineering firm questioned the integrity of all the work Speedy had done on the upper fifth floor. The firm had not been able to evaluate Speedy's concrete work until after Speedy was terminated because the concrete had not yet cured. Tr. 241-242. The entirety of the work that Speedy had completed on the fifth floor was redone by Osorio. The total amount of money Windsor had paid Speedy for its work on the fifth floor was $44,300.

{¶ 59} Based on the evidence submitted at trial, the trial court did not lose its way in finding that there had been a contract, that Windsor had performed under the contract, that Speedy had breached the contract, and that Windsor had been damaged as a result of the breach. Therefore, the trial court's judgment with respect to Windsor's breach of contract claim was not against the manifest weight of the evidence. Further, the trial

court's decision to not award Speedy anything on its claims was not against the manifest weight of the evidence.

### b. Slander of Title

{¶ 60} Slander of title to real estate "is a tort action against one who falsely and maliciously defames title to property and causes some special pecuniary damages or loss." (Citations omitted.) *Acme Constr. Co. v. Continental Natl. Indemn. Co.*, 2003-Ohio-434, ¶ 46 (8th Dist.). "Typically, slander-of-title cases involve documents filed against a particular piece of property by parties who claim an interest in the property." *Green v. Lemarr*, 139 Ohio App.3d 414, 431 (2d Dist. 2000). " 'The wrongful filing for the record of a document which casts a cloud upon another's title to or interest in realty is considered to be an act of publication which gives rise to an action for slander of title.' " *Gasper v. Bank of Am., N.A.*, 2019-Ohio-1150, ¶ 36 (9th Dist.), quoting *Smith Elec. v. Rehs*, 1998 WL 103334, *2 (9th Dist. Feb. 18, 1998). To prevail on a slander of title claim, "a claimant must prove '(1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages.' " *Green* at 430-431, quoting *Colquhoun v. Webber*, 684 A.2d 405, 409 (Me. 1996). " 'As a general rule, wrongfully recording an unfounded claim to the property of another constitutes slander of title.' " *Cuspide Properties, Ltd. v. Earl Mechanical Servs.*, 2015-Ohio-5019, ¶ 37 (6th Dist.), quoting *McClure v. Fischer Attached Homes*, 145 Ohio Misc.2d 38, ¶ 21 (C.P. 2007).

{¶ 61} Both parties agree that Speedy filed a mechanics lien against Windsor.

"The filing of a mechanic's lien satisfies the publication element." *Prater v. Dashkovsky*, 2007-Ohio-6785, ¶ 13 (10th Dist.), citing Prosser, *The Law of Torts*, § 122, at 939 (3d Ed. 1964). The trial court found that Windsor had proven its slander of title claim by a preponderance of the evidence based on its determination that: 1) Speedy was not owed the claimed lien amount; 2) Speedy's lien claim was reckless; and 3) Windsor had actual damages for having to post a bond to discharge the lien. Speedy argues on appeal that "the mechanics lien field by Speedy was justified and he is entitled to payment of $66,000 owed on the contract breached by Windsor." Appellant's Brief, p. 13. We find Speedy's argument unpersuasive.

**{¶ 62}** The trial court found that the lien was false on its face considering that the contract was for an agreed price of $75,000 for completion of the fifth floor and Windsor had paid Speedy $44,300 for Speedy's substandard performance. On November 6, 2019, Windsor sent Speedy a letter terminating their contract for cause. That same day, Speedy's employee signed the mechanics lien claim form, which was notarized, stating that in accordance with the agreement of the parties, the value of the project at 40 West 4th Street was $85,000, of which $66,000 remained unpaid. Although the mechanics lien was not recorded until January 14, 2020, no changes were made before it was filed. Stevens testified that the $66,000 amount was based on an $85,000 contract price and that Windsor had only paid $19,000 for the 40 West 4th Street project. Stevens admitted during cross-examination that it was possible one or two payments from Windsor may not have been included in the $19,000 total. Stevens also testified that as of November 6, 2019, Windsor had paid $39,000-42,000, and Windsor paid an additional $4,000 after the

termination.

**{¶ 63}** The record reflects that a slanderous statement disparaging Windsor's title was published when the mechanics lien was recorded, the statement was false or made with reckless disregard of its falsity, and Windsor was damaged by having to pay $3,960 to bond off the lien. We conclude that the trial court's judgment finding that Windsor proved its slander of title claim was not against the manifest weight of the evidence. This is not the exceptional case in which the evidence weighed heavily against the judgment.

**{¶ 64}** Speedy's sole assignment of error is overruled.

### III. Conclusion

**{¶ 65}** Having overruled the assignment of error, the judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and TUCKER, J., concur.